Kevin G. Little, SBN 149818
Michelle L. Tostenrude, SBN 290121
Post Office Box 8656
Fresno, CA 93747
Telephone:   (559) 708-4750
Facsimile:   (559) 420-0839
E-Mail:       kevinglittle@yahoo.com

Attorneys for Plaintiffs Pamela Motley, Estate of Cindy
Raygoza, Yvette Caldera, Valerie Caldera, and Danny Rice

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

| | |
|---|---|
| PAMELA MOTLEY; ESTATE OF CINDY RAYGOZA, through its legal representative and administrator, YVETTE CALDERA; YVETTE CALDERA, VALERIE CALDERA; DANNY RICE, <br><br>         Plaintiffs, <br><br>     vs. <br><br> FRESNO POLICE OFFICER JOSEPH SMITH; FRESNO POLICE OFFICER BRIAN LITTLE; FRESNO POLICE OFFICER DERRICK JOHNSON; FRESNO POLICE OFFICER MICHAEL COUTO; FRESNO POLICE OFFICER BERNARD FINLEY; FRESNO POLICE OFFICER BYRON URTON; UNKNOWN FRESNO POLICE OFFICERS; THE CITY OF FRESNO, CALIFORNIA, <br><br>         Defendants. | Case No. <br><br> COMPLAINT FOR DAMAGES AND DECLARATORY/INJUNCTIVE RELIEF <br><br> 42 U.S.C. §1983 <br>    Equal Protection <br>    Substantive Due Process <br>    Municipal Liability <br>    Loss of Familial Relations <br>28 U.S.C. §2201 <br>Negligence <br>Wrongful Death <br>C.C.P. §526, 1060 <br><br> JURY TRIAL DEMANDED |

///

///

///

TO THE HONORABLE COURT:

Plaintiffs Pamela Motley, Estate of Cindy Raygoza, Yvette Caldera, Valerie Caldera, and Danny Rice, through their undersigned counsel, hereby make the following allegations against the defendants:

## **INTRODUCTION**

1.     Violence against women is an extremely serious and widespread problem throughout the United States.  Violence against women takes many forms, including physical violence, sexual violence, psychological and emotional abuse, financial abuse, intimidation, isolation and manipulation.  Nearly half of American women will be the subject of some form of gender-based violence, and that figure is suspected by many to be too low, since many women never report violence due to the process of victimization, i.e., being overcome by fear, hopelessness and/or damaged self-esteem.

2.     Violence against women is criminal conduct.  Since the enactment of the federal Violence Against Women Act in 1994, virtually every state has adopted and enacted enabling legislation to help protect women from violence.  Those laws are intended to promote a more uniform and vigorous national enforcement of the laws protecting women from violence.

3.     Violence against women is perhaps even more prevalent in Fresno, California.  Fresno routinely is among the statewide leaders in the reported incidents of violence against women per capita.   However, despite the dire need for effective, proactive, and timely enforcement of violence against women laws in Fresno, these laws are often not fully complied with by the Fresno Police Department.   Equally unfortunate is that Fresno women who muster the courage to report the violence against them are all too often revictimized, i.e. belittled, ignored, slighted, traumatized and thus injured a second time by those to whom they report the initial injury and victimization.

Revictimization has been shown to discourage victims of violence against women from coming forward and/or insisting on their rights as victims.

4.      Fresno women are being severely harmed as a result of the lax enforcement of the laws protecting them from violence and also from being revictimized by Fresno Police officers.  This case involves the claims of two such women, Pamela Motley, still alive but in a quadriplegic state, and Cindy Raygoza, unfortunately deceased.  As detailed herein, these plaintiffs' claims are supported by reports of many fellow victims, who have been lucky enough not to be injured as severely.

## JURISDICTION AND VENUE

5.      This Court has original jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 1331, 1343, and 1367, as this action is one arising under the federal civil rights laws and also includes supplemental state law claims.

6.      This Court has venue in this action pursuant to 28 U.S.C. § 1391(b), as the incidents giving rise to this action all occurred within this judicial district.

## PARTIES

7.      Plaintiff Pamela Motley ("Pamela") is a citizen and resident of the County of Fresno, State of California.

8.      Plaintiff the Estate of Cindy Raygoza ("the Raygoza estate") is suing in this action on behalf of decedent Cindy Raygoza ("Cindy"), though the legal representative and administrator of the estate, Yvette Caldera ("Yvette").   Yvette has been named the administrator of the Raygoza estate pursuant to California Probate Code § 13100, based on the present amount of the Raygoza estate. Yvette also represents the Raygoza estate for purposes of the state law claims in this action pursuant

to California Code of Civil Procedure § 377.32, and the requisite declaration is Exhibit A to this Complaint.

9.      Yvette is also a plaintiff in her individual capacity.  Yvette is a citizen and resident of Fresno County, State of California.  Yvette is Cindy's surviving adult daughter.

10.      Plaintiff Valerie Caldera ("Valerie") is a citizen and resident of Fresno County, State of California.  Valerie is Cindy's surviving adult daughter.

11.      Plaintiff Danny Rice ("Danny") is a citizen and resident of Fresno County, State of California.  Danny is Cindy's surviving adult son.

12.      Defendant Fresno Police Officer Joseph Smith ("Officer Smith") is believed to be a citizen and resident of the State of California.   Officer Smith has been employed as a peace officer with the Fresno Police Department at all pertinent times alleged herein.  At all material times herein, Officer Smith acted individually and within the course and scope of his employment with the Fresno Police Department.  Officer Smith is sued in his personal capacity for acts he performed under color of law for the causes of action set forth herein.

13.      Defendant Fresno Police Officer Brian Little ("Officer Little") is believed to be a citizen and resident of the State of California.   Officer Little has been employed as a peace officer with the Fresno Police Department at all pertinent times alleged herein.  At all material times herein, Officer Little acted individually and within the course and scope of his employment with the Fresno Police Department.  Officer Little is sued in his personal capacity for acts he performed under color of law for the causes of action set forth herein.

14.      Defendant Fresno Police Officer Derrick Johnson ("Officer Johnson") is believed to be a citizen and resident of the State of California.   Officer Johnson has been employed as a peace officer with the Fresno Police Department at all pertinent times alleged herein.  At all material times

herein, Officer Johnson acted individually and within the course and scope of his employment with the Fresno Police Department.  Officer Johnson is sued in his personal capacity for acts he performed under color of law for the causes of action set forth herein.

15.     Defendant Fresno Police Officer Michael Couto ("Officer Couto") is believed to be a citizen and resident of the State of California.   Officer Couto has been employed as a peace officer with the Fresno Police Department at all pertinent times alleged herein.  At all material times herein, Officer Couto acted individually and within the course and scope of his employment with the Fresno Police Department.  Officer Couto is sued in his personal capacity for acts he performed under color of law for the causes of action set forth herein.

16.  Defendant Fresno Police Officer Bernard Finley ("Officer Finely") is believed to be a citizen and resident of the State of California.   Officer Finley has been employed as a peace officer with the Fresno Police Department at all pertinent times alleged herein.  At all material times herein, Officer Finley acted individually and within the course and scope of his employment with the Fresno Police Department.  Officer Finley is sued in his personal capacity for acts he performed under color of law for the causes of action set forth herein.

17.     Defendant Fresno Police Officer Byron Urton ("Officer Urton") is believed to be a citizen and resident of the State of California.   Officer Urton has been employed as a peace officer with the Fresno Police Department at all pertinent times alleged herein.  At all material times herein, Officer Urton acted individually and within the course and scope of his employment with the Fresno Police Department.  Officer Urton is sued in his personal capacity for acts he performed under color of law for the causes of action set forth herein.

18.     At all material times herein, defendants Unknown Fresno Police Officers, whose names and capacities are currently unknown, were peace officers employed by the Fresno Police

Department at all pertinent times alleged herein.   Unknown Fresno Police Officers acted individually and within the course and scope of their employment, either in a supervisorial or ministerial capacity. Along with the named defendants, each of the Unknown Fresno Police Officers is responsible in some manner for the injuries and damages alleged herein.  Plaintiffs will amend this Complaint to rename these fictitious defendants as soon as their respective names and capacities are ascertained. Unknown Fresno Police Officers are sued in their personal capacities for acts they performed under color of law, and they are also sued in their personal capacities under state law for the causes of action set forth herein.

19.    Defendant City of Fresno ("Fresno") is local municipal body and a political subdivision of the State of California.  Fresno is primarily responsible funding and supervising the Fresno Police Department.  As more specifically alleged herein, plaintiffs are informed and believe that the customs, policies and practices of Fresno contributed to the constitutional violations alleged herein.

**FACTUAL ALLEGATIONS**

**Allegations Pertaining Specifically to Pamela Motley**

20.    In early January 2014, Pamela had learned that her husband of 28 years, Paul Motley ("Paul") had been having an extramarital affair.  Pamela arranged a public meeting between herself, Paul, and the other woman, C.T., on January 6, 2014.  During that meeting, Paul lost his temper and struck C.T. very hard in her face with a beer mug, breaking the mug and seriously injuring C.T.  Paul was arrested later that evening.

21.    While Paul was in custody, Pamela moved out of the family home and into the Fresno home of her parents.  Officers are typically trained that violence against women has a greater potential to occur when the woman tries to leave the abuser.

22.     Upon his release from jail, Paul was obviously unstable, and his conduct resulted in his being taken in on a California Welfare and Institutions § 5150 hold on January 10, 2014.  This information was thereafter available to the Fresno Police Department.  The Fresno Police Department was also aware of Paul's bail restrictions related to the pending criminal case related to his attacking C.T.  Included in those conditions were his having to refrain from similar misconduct and also to obey all laws.

23.     After his release from the 5150 hold, Paul professed an inclination to attempt to change so that he could save his marriage, and he began going to church and counseling in late January, February, and early March 2014.   Paul also promised to take his prescribed psychotropic medication.

24.     During early March 2014, after an ugly episode at a church retreat, Pamela informed Paul that she was going to go ahead with her plans to seek a divorce and that she was no longer willing to consider reconciliation.  Officers are trained that the potential for violence increases when women take formal steps to leave their abusers.

25.     Therefore, by the second week of March 2014, Pamela was estranged from and intent on divorcing Paul.  Pamela had already retained a divorce attorney.  Upon learning these facts, Paul reacted extremely angrily and violently.   On March 12, 2014, Paul went to Pamela's parents' house and confronted Pamela about the divorce papers he had received and demanded his wedding ring back.  Paul attacked and injured Pamela.  Paul fled the scene when Pamela's mother called 911. Pamela also called the Fresno Police Department requesting service on March 13, 2014.

26.     There was no police response until the morning of March 14, 2014.  Defendant Officers Smith and Little responded.  Pamela showed the officers her injuries, which consisted of extensive bruising on her left leg, hip and buttocks area, as well as an injury to her left ankle.

Officers Smith and Little never told Pamela about her citizen's arrest rights, or provided her with any of the informational materials that domestic violence victims are entitled to receive under California law.

27.     Officer Smith and Little then went to Paul's residence and served him with an emergency protective order that had been issued by Fresno Superior Court Judge John Vogt.  When interviewed, Paul reportedly admitted that he went to Pamela's residence and initiated the physical contact by grabbing Pamela's wrists and attempting to forcibly remove her wedding ring.  Officers Smith and Little were also aware of Paul's prior attack of C.T., the pending criminal case and bail restrictions related to that incident, and Paul's recent 5150 hold.  Officers Smith and Little were also aware that Paul had not surrendered his firearm despite having been legally required to do so as a result of his 5150 hold.  However, despite all of this information, Officers Smith and Little did not arrest Paul.

28.     Officers Smith and Little did not arrest Paul because he had a feint bite mark on his left hand, and a bruise from his and Pam's falling off the from porch during his attack.   The case was therefore considered to be one involving mutual combat.  However, Paul's injuries were perfectly consistent with Pamela's account of the incident.  When both parties have injuries, officers responding to the scene of a domestic violence call are supposed to make a reasonable attempt to determine who the dominant aggressor was.  Officers can consider the individual's histories in making this determination as well as other available evidence.  The fact that Paul had a recent violent history against women, had a pending criminal case and bail restrictions involving a crime of violence against a female, had initiated the incident by coming over to where Pamela was staying, had admittedly grabbed Pamela's wrists in an attempt to remove her property against her will, and had caused her significant injury, were all signs weighing heavily in favor of a determination that

Paul was the dominant aggressor.  Officer Smith and Little's decision not to arrest Paul was also contradictory to their request for an emergency protective order, which required them to have reasonable cause that the protected party (Pamela) was in danger.

29.     Had Paul been arrested, he likely would have remained in custody, because he would have been in violation of his bail conditions in the ongoing criminal case, would have been held without bail and/or would have had to pay additional bail that he would have been unable to afford. Indeed, even if Paul's bail in the pending case involving C.T. had not been revoked or increased, Paul would have had a presumptive bail of $150,000 for committing a second act of violence against women while on bail, as per the bail schedule then in effect in Fresno County.  Paul would therefore likely have had to pay a $15,000 surety premium, which was not within his financial wherewithal at the time.  It is therefore likely that Paul would have remained in custody beyond the time of the April 12th incident detailed below.

30.     Because Pamela was very fearful of Paul and his ongoing actions, she obtained a domestic violence restraining order against him on approximately March 18, 2014, prior to the expiration of the aforementioned emergency protective order.  The domestic violence restraining order was obtained in Fresno County Superior Court Case No. 14CEFL00135.  The domestic violence restraining order prohibited Paul from contacting Pamela, coming to her residence or place of work, and also from harassing, stalking, or engaging in other enumerated activities.  The terms and conditions of a domestic violence restraining order are fairly standard and are well known to trained officers.  The hearing to extend the temporary restraining order was set for April 9, 2014.

31.     On March 24, 2014, Paul stalked and harassed Pamela at her place of employment, the Rite-Aid pharmacy, located at Shaw and West Avenues in Fresno.  This was a continuation of conduct that Paul had been engaging in, both in person and by phone, since Pamela had told him she

wanted a divorce.  Paul's actions on March 24th placed Pamela in great fear.  Pamela called the

Fresno Police Department, and defendant Officers Johnson and Couto arrived.  Pamela told them

about what had occurred that day, as well as Paul's actions over the past few weeks.  Paul was still

present when Officer Johnson arrived.  Officers Johnson and Couto noted that Paul had not yet been

served with the temporary domestic violence restraining order, and he served him with the same.

However, despite being told of Paul's pattern of behavior, Officers Johnson and Couto did not take

any other action or advise Pamela of her citizen's arrest rights to take action herself.   Pamela was

also not given any informational domestic violence materials.  Paul was subject to arrest for a

violation of Penal Code § 646.9 on that date, and his arrest on these charges would have likely

resulted in his remaining in custody, for the reasons explained above in paragraph 25.

       32.     On March 25, 2014, Pamela again contacted the Fresno Police Department.  That

morning, she woke up to find that Paul had deflated her tires overnight and also had been calling and

texting her.  All of these actions were in violation of the temporary domestic violence restraining

order.  No officer responded to Pamela's calls that morning.  Later that day, Pamela called again to

report that Paul was continuing to call and text her in violation of the temporary restraining order.

Later that evening, defendant Officer Finley responded and confirmed that Paul had made calls and

sent texts and that there was indeed a valid temporary restraining order in effect that had been served.

Violation of a domestic violence restraining order is a presumptive felony under California Penal

Code § 273.6, and officers have a mandatory obligation to arrest under California Penal Code §

836(c)(1).  Paul was also subject to arrest for a violation of Penal Code § 646.9 on that date, and that

is also a presumptive felony charge.   The only thing Officer Finley did was reportedly go to Paul's

address to try to contact him one time.  Officer Finley's report did not even mention Pamela's

deflated tires.  No arrest warrant was sought or obtained, and Pamela was again not informed of her

citizen's arrest rights to take action herself.   Pamela was also not given any informational domestic violence materials.   Paul's arrest on any of these charges would have likely resulted in his remaining in custody, for the reasons explained above in paragraph 25.

33.     On March 28, 2014 at 11:17 p.m., Pamela again called the Fresno Police Department after Paul continued to call and text her.   Pamela also reported that she had received information from a third party that Paul had threatened to kill her and her parents.   This threat was consistent with the tenor of the text messages Pamela was receiving from Paul herself.   Fearing for her life and not having received any police response over two hours later, Pamela went to stay with her daughter in nearby Kerman, California.   The only thing the Fresno Police Department, via dispatcher, was to tell Pamela to contact the department again when she could.   An officer response was canceled.   There is no reason why the Fresno Police Department was prevented from going to Kerman to take Pamela's statement, or at least asking the department with primary jurisdiction, the Kerman Police Department, to assist.   Nothing was done, however.   No arrest warrant was sought or obtained, and Pamela was again not informed of her citizen's arrest rights to take action herself.   Pamela was also not given any informational domestic violence materials.   Paul was subject to arrest for violation of a domestic violence restraining order, which is a presumptive felony under California Penal Code § 273.6 and a mandatory arrest offense under California Penal Code § 836(c)(1).   Paul was also subject to arrest for a violation of Penal Code § 646.9 on that date, and that is also a presumptive felony charge.   Paul's arrest on any of these charges would have likely resulted in his remaining in custody, for the reasons explained above in paragraph 25.

34.     Had any of the responding officers to this point sought and obtained an arrest warrant for Paul, he would have been arrested on or before April 3, 2014.   Paul appeared in court that day, in relation to restraining order proceedings initiated by Pamela's parents.   However, because no arrest

warrant had been sought or obtained, Paul was able to walk freely out of the Fresno Superior Court that afternoon.

35.     On April 7, 2014, Paul continued his threatening actions.  Paul followed Pamela as she was driving and blocked her in at a cul-de-sac near her parents' residence.  Pamela had one of her friend's children in the vehicle at the time.  Paul threatened to kill Pamela on their wedding anniversary, April 14, 2014, one week away.  Specifically,  Paul told Pam that he was going to shoot her with a .38 gun if she did not come back to him by then. The responding officer, defendant Officer Urton, was told of Paul's death threat that day, as well as his threatening conduct on recent days. Officer Urton was advised that there was a restraining order in effect that was violated by Paul's sending texts and making calls.  Officer Urton seemed insensitive and rude to both Pamela and other witnesses who were present and available to give corroborating statements.  Officer Urton also refused offers to review Pamela's phone.  Indeed, Officer Urton did not even exit his vehicle or turn his engine off when speaking to Pamela.  Even worse, Officer Urton told Pamela that she should not be too worried because "These guys only follow through 1 percent of the time."  This statement was overheard by multiple witnesses.  The only thing Officer Urton did was reportedly go to Paul's address to try to contact him one time.  No arrest warrant was sought or obtained, and Pamela was again not informed of her citizen's arrest rights to take action herself.   Pamela was also not given any informational domestic violence materials.  Paul was subject to arrest for violation of a domestic violence restraining order, which is a presumptive felony under California Penal Code § 273.6 and a mandatory arrest offense under California Penal Code § 836(c)(1).  Paul was also subject to arrest for a violation of Penal Code § 646.9 on that date, and that is also a presumptive felony charge.   Paul's arrest on any of these charges would have likely resulted in his remaining in custody, for the reasons explained above in paragraph 25.

36.     Had any of the responding officers to this point sought and obtained an arrest warrant for Paul, he would have been arrested on or before April 9, 2014.  Paul appeared in court that day, in relation to restraining order proceedings initiated by Pamela.  However, because no arrest warrant had been sought or obtained, Paul was able to walk freely out of the Fresno Superior Court that afternoon.  Pamela received the requesting continuing restraining order against Paul that day.

37.     On April 12, 2014, Paul was lying in wait for Pamela as she returned to her parents' house after work.  Paul shot Pamela at close range in the face and then shot himself.  Ironically, that Pamela was going out leave town the next morning, so that she would be out of town before her anniversary.

38.     Pamela was barely alive when the ambulance arrived, and she was rushed to the hospital.  Pamela underwent emergency surgery and remained in intensive care clinging to life for several days.  It was weeks before Pamela finally  realized she was unable to feel or control her body.  Pamela remained in the hospital for several weeks, before being transported to a rehabilitation facility in the Bay Area, where she continued to recover and learn to deal with her extreme limitations.

39.     It was only after Pamela's life was nearly lost and there was no one alive to arrest or prosecute that the Fresno Police Department performed an appropriate investigation.  Pamela believes that many of the details that appear in the reports from her earlier calls for service were derived from the investigation into  the April 12, 2014 shooting incident.  For example, although Officer Urton refused to read Pamela's text messages, a fact which several witnesses can confirm, his report details certain text messages which were not provided to the Fresno Police Department until after the April 12, 2014 shooting.

40.     Pamela's present life is a world apart from what it used to be.  She is confined to a motorized wheelchair with no sensation of body control from the upper chest down.   Pamela also

lost her eye as a result of the shooting and now has very limited vision.  Pamela is emotionally

devastated.  Nowadays, due to her immobility, Pamela is largely homebound.  Pamela has to rely on

other for all her needs and receives the medical assistance that her limited insurance allows.   Pamela

takes numerous medications for her present conditions and requires frequent monitoring and care.

Doctors  have advised that Pamela will not recover any more than she already has.  Pamela is 55

years old, and, as per her doctors, her life expectancy has not been affected by her injuries.  Pamela

will therefore likely live twenty or more years in her current state and with her present limitations.

### Allegations Pertaining Specifically to Cindy Raygoza

41.     In February 2014, Cindy called the police because her ex-boyfriend, Michael Reams

("Reams"),  who had been terrorizing her, entered her residence without consent, attacked her, pinned

her to the floor by her throat and choked her.  Reams fled to avoid the police, whom Cindy had called

before Reams broke into her residence.  Reams committed these acts of violence in the presence of

Cindy's young grandson.

42.     The name of the Fresno Police Officer who responded is unknown, and Fresno refused

to respond to plaintiffs' public records request to obtain information that would have included the

Unknown Fresno Police Officer's name.

43.     When the Unknown Fresno Police Officer took Cindy's statement, she provided

Reams' name.    The Unknown Fresno Police Officer had dispatch check Reams' criminal history.

The Unknown Fresno Police Officer then informed Cindy that Reams had previously served a prison

term for domestic violence, not an injury DUI as he had told her.

44.     Cindy and Yvette explained to the Unknown Fresno Police Officer that Cindy was a

domestic violence survivor from a prior marriage.  The Unknown Fresno Police Officer then took it

upon himself to berate Cindy and criticize her choices of men.  The Unknown Fresno Police Officer

then issued Cindy an ultimatum, saying that since she was now on notice about Reams' history, if she continued to associate with him she would be "crying wolf" and would not receive any responses to her calls or service to her address.   This revictimizing statement was made in Yvette's presence.

45.    The officer then claimed that he would arrest Reams for violating his parole. However, plaintiffs are informed and believe that no serious effort was made by the Unknown Fresno Police Officer to seek or obtain an arrest warrant for Reams, or to notify Reams' parole agent of his law violation.   Based on his actions, Reams also was subject to arrest for many charges other than the parole violation, including domestic violence, battery, stalking, and perhaps even attempted murder.  To plaintiffs' knowledge, no effort was made to investigate or arrest Reams on any of these charges.  Certainly, no law enforcement officer ever followed up with Cindy, and Cindy also was not informed of her citizen's arrest rights or provided any informational materials about her rights as a domestic violence victim.

46.    Had Reams been arrested for the February 2014 incident, he would likely have remained in custody, since he would have been facing, at minimum, a repeat domestic violence offense and parole violation.  Reams would likely have not been out of custody to cause Cindy's death as alleged in the next paragraphs.

47.    After the February 2014 incident, Reams, who remained at large, continued to terrorize Cindy.  The Unknown Fresno Police Officer's revictimizing words to Cindy stuck with her, and she never again contacted law enforcement, since she believed that they would not respond to her address.

48.    On July 14, 2014, Reams again broke into Cindy's residence while Cindy was again babysitting her grandson.  Sensing the danger she was facing, Cindy got her young grandson out of her apartment window and to safety moments before Reams succeeded in breaking in.  Reams was

armed with a knife.  Reams proceeded to attack Cindy, pin her on the ground, and stab her repeatedly.   Neighbors had called the Fresno Police Department, but by the time officers got to Cindy's apartment, it was too late for her.  Reams was still on top of Cindy stabbing her lifeless body when officers arrived, shot him in the head, and killed him.

49.     Cindy had a close, loving relationship with all her children, all of whom have been affected deeply by her untimely death.  The Raygoza estate has also sustained damages related to Cindy's stabbing death, which include pre-death suffering, lost income, and funeral expenses.  The Ninth Circuit has ruled that pre-death pain and suffering is recoverable under the federal civil rights laws.  *See Chaudhry v. City of Los Angeles*, 751 F.3d 1096 (9th Cir. 2014).

### Allegations Pertaining to All Plaintiffs

50.     Investigation to this point has shown that, unfortunately, Pamela's and Cindy's treatment by the Fresno Police Department are not isolated.  Several others have been discovered, to wit:

51.     H.H. was in an abusive relationship in 2005 and 2006 with D.P.  H.H. called the Fresno Police Department on numerous occasions, only to be revictimized.  On some occasions, H.H. was forced to leave her residence she shared with D.P., even though it was obvious she had been beaten and/or sexually assaulted.  Officers would take the word of D.P. and his mother over hers. D.P. was not arrested even when neighbors corroborated her reports.  On one night after being beaten and sexually assaulted, H.H. had nowhere to go and had to sleep in a local homeless shelter.  On another occasion, H.H. had been beaten mostly on the back and the Fresno Police officers who responded asked her rhetorically how they could rule out that her injuries were self-inflicted.  On another occasion after being sexually assaulted by D.P., H.H. called the Fresno Police Department and was in the process of being taken by ambulance for medical treatment and rape kit collection

when, amazingly, the ambulance was summoned back to the incident scene, where the officer interviewed her further.  The officers on scene told H.H. that she was not "acting like a rape victim." The officers on scene told her they believed she was lying.  The officers spoke to D.P. and his mother in H.H.'s presence.  D.P. was not arrested, and H.H. was sent to the hospital and then to the Marjaree Mason Center.  Although H.H.'s medical examination showed she had sexual assault injuries, she felt so victimized that she did not pursue the matter further.

52.     In 2011, H.H.'s 7 year old daughter was raped by C.W., H.H.'s then boyfriend  The Fresno Police officers who responded were more interested in whether H.H. was using marijuana around her daughter than if her young daughter had been raped.  Because H.H. out of fear initially denied using marijuana, the officers told her she was a liar and a horrible mother and that they would not believe her rape allegations.  The officers accused her of lying because her boyfriend had broken up with her.  The officers even threatened to take H.H.'s daughter from her.  Even after C.W. admitted during a parole hearing to the rape, the Fresno Police officers refused to turn the matter over to the District Attorney's Office, claiming a lack of evidence.  The officers also refused to disclose the results of H.H.'s daughter's rape kit.  Ultimately, only after C.W. turned himself in and confessed, was he prosecuted and convicted.

53.     In late 2014, R.M. was beaten by her significant other while she was driving because she insisted that he turn the radio down so as not to wake up her children who were riding with them. R.M. was then punched in the face while driving on the freeway.  R.M. was hit so hard that her glasses broke, her face was injured, and her head hit the driver's side window.  The blows also caused R.M. to get into a single car accident with her children in the car.  R.M.'s boyfriend fled the scene after the accident.  When the Fresno Police officers showed up, R.M. told them what happened, but they did not even take pictures of her injuries.  R.M. also was not told of her citizen's arrest rights or

given any informational materials regarding domestic violence.  R.M.'s significant other was never

arrested.  R.M. was never recontacted about the incident.

54.     In 2013, J.M. was attacked by her boyfriend, who threw her through a bedroom

window.  J.M.'s boyfriend then attacked her and cut her wrists with a shard of the broken glass.

When Fresno Police Officers arrived, the boyfriend told the officers that J.M. had attempted to

commit suicide.  Despite the clear unlikelihood of the boyfriend's story and J.M.'s contrary

statement, no further action was ever taken.

55.     In 2012, A.H. moved to Fresno to get away from her abusive ex-boyfriend.  A.M. had

obtained a domestic violence restraining order in Madera Superior Court prior to her move.  Shortly

after A.H. moved to Fresno, her ex-boyfriend began showing up at her new residence and threatening

her.  A.H. called the Fresno Police Department and told them she had a domestic violence restraining

order numerous times, but on each occasion she was told that she had to enforce her restraining order

in Madera County, because that was the county of issuance.  This is absolutely false.  Consistent with

California state law and the Violence Against Women Act, domestic violence restraining orders are

enforceable not only statewide, but nationwide as well.

56.     In 2012, S.L. made numerous calls reporting abuse by her husband.  In September

2012, S.L. made a report to the Fresno Police Department and had bruises to corroborate her account

of physical abuse, but no arrest was ever made.  To the contrary, when S.L.'s husband called the

Fresno Police Department a few days later, S.L. was taken in on a 5150 hold based on the word of her

abuser, and despite the fact that S.L.'s bruises were still apparent.

57.     In approximately 2008, N.V. called the Fresno Police Department because her ex-

husband had her young daughter in a hot car with the windows rolled up.  N.V. was understandably

frantic.  However, the officers who arrived on scene ended up taking N.V. in on a 5150 hold based on

her ex-husband's report.   Overall, N.V. has called the Fresno Police regarding domestic violence issues numerous times, related to both her ex-husband and her later boyfriend.  One on occasion, the officers actually kicked her out of her apartment, despite the lease being only in her name, because her ex-husband's driver's license had the apartment address.  On numerous other occasions, even though N.V. was the reporting party, Fresno Police officers would routinely speak to her abusers first and take their sides, even though she had obvious physical signs of abuse.

58.     In 1999, N.T., then 14, was raped by an older man.  When N.T.'s parents found out about the incident approximately a year later, the Fresno Police Department was called.  The officer who responded spoke to the suspect first, and then told N.T. that because she was unable to say that the suspect had an appendectomy scar that he did not believe her and would not take her report.  N.T. was never advised of her rights as a domestic violence victim.  A decade later in 2009, N.T. was attacked and beaten by her husband and hit him back in self-defense.  N.T.'s physical injuries made it obvious she was the victim.  The Fresno Police officers who arrived made no effort to determine who was the dominant aggressor and told N.T. that she and "her husband just needed a break."  No arrest was made, and N.T. was not informed of any of her rights as a domestic violence victim.  Instead, N.T.'s husband agreed to spend the night elsewhere.  In 2011, N.T.'s husband attacked and beat her again and then broke down the door to the bedroom where she had run to get away from him.  When Fresno Police officers responded, they contacted N.T.'s husband first and ended up arresting N.T., even though the bedroom door was broken down and N.T. had obvious physical injuries.

59.     In 2014, a high ranking Fresno Police Department official contacted a local victim advocate and complained that he was telling Fresno sexual assault victims that they were entitled to rape kits at the expense of the department.  The Fresno Police Department official made this complaint to the victim advocate about as a matter of state law sexual assault victims are entitled to

have local law enforcement pay for their rape kits.  Apparently, the Fresno Police Department official did not want the victim advocate to go out of his way to inform sexual assault victims of this entitlement.

60.     In a November 2014 presentation regarding domestic violence issues, Fresno Police Chief Jerry Dyer conceded that there are still officers in his department "who just do not get it" when it comes to domestic violence.  Of course, a victim could well encounter one of these unsympathetic officers at a crucial, life or death juncture.

61.     The foregoing are just a few of many possible examples of the Fresno Police Department's failure to take adequate measures to fully enforce laws protecting violence against women and also to prevent courageous victims who reach out to law enforcement from being revictimized.  A police department's having written policies that appear to comply with applicable law has little meaning if these policies are not adhered to as a practical matter.  In practice, the Fresno Police Department has failed to live up to the Violence Against Women Act and do everything it can to prevent gender-based violence and revictimization of female victims.

62.     Based on the foregoing, plaintiffs are informed and believe that the discriminatory, biased, and lax law enforcement response which Fresno women frequently suffer in cases involving violence against women suffer against them as a result of an unwritten policy and custom of discriminating against women in general.   The Fresno Police Department has failed and refused to require non-discriminatory attitudes and behavior toward women, and victims of gender-based violence against women in particular, and victims of domestic violence generally by Fresno Police Officers and their supervisors to follow clearly-established laws, and current appropriate standards of conduct and action in dealing with victims of gender-based violence and domestic violence in general.  As a result, plaintiffs are informed of the aforementioned many recent cases in which

women reasonably seeking law enforcement help and protection from gender-based violence and domestic violence in general have been discouraged from contacting the police in the future, deliberately non-advised of remedies, and sources of help, misled about laws, forced to make repeated calls in order to get any law enforcement response at all, and in general actively blocked, impaired and dismissed in their attempts to find access to justice.  As a further result, women who are victims of gender-based crimes have frequently become discouraged and abandon their efforts to obtain help.

**CLAIMS FOR RELIEF**

FIRST CLAIM FOR RELIEF

42 U.S.C. § 1983 - Denial of Equal Protection and Substantive Due Process; Municipal Liability

(By Plaintiffs Pamela Motley and the Estate of Cindy Raygoza Against All Defendants)

63.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 62, as though fully set forth herein.

64.     At all relevant times, by their actions and the conduct alleged in this Complaint each of the individual defendants intentionally discriminated against women, and, in particular, women who are victims of gender-based violence.  The individual defendants discriminated against Pamela and Cindy by denying them the equal protection of the laws protecting women from gender-based violence.

65.     At all pertinent times, Pamela and Cindy had a constitutional right to have police services administered in a nondiscriminatory manner – a right that is violated when a state actor denies such appropriate protection to disfavored persons. See  *Navarro v. Block,*  72 F.3d 712, 715-717 (9th Cir. 1995); *Estate of Macias v. Ihde*, 1019 F.3d 1019, 1028 (9th Cir. 2000) (recognizing a cause of action under § 1983 based upon the discriminatory denial of police services to domestic

violence victims).  Law enforcement's lax or offensive actions in handling domestic violence cases are indicative of discriminatory intent.  See *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 701 (9th Cir. 1990) (officer's misogynist comments during a domestic violation were proof of discriminatory intent).  The individual defendants all were acting under color of law and in that capacity they denied Pamela and Cindy their rights to the provision of police services in a non-discriminatory manner.

66.     Additionally, Pamela and Cindy also had a substantive due process right against being subjected to state-created danger.  While there is no affirmative constitutional duty to protect a citizen from third party violence, when a state actor becomes involved and through her intentional actions worsens the citizen's situation and creates a danger worse or in addition to those faced by the citizen, that state actor has violated the citizen's substantive due process rights.  *See Huffman v. County of Los Angeles*, 147 F.3d 1054, 1061 (9th Cir. 1998).  The individual defendants placed both Pamela and Cindy in a more dangerous situation than they otherwise would have been in by misleading them as to their investigative actions and whether or not Pamela's and Cindy's abusers would be brought to justice.  The individual defendants also put Pamela and Cindy in worse situations than they otherwise would have been by revictimizing them and thereby discouraging them from making calls for service they otherwise would have made.  In denying Pamela and Cindy their substantive due process rights, the individual defendants were also acting under color of state law.

67.     As shown through the allegations set forth above, the Fresno Police Department's customs, policies and practices, were also a moving force behind the aforementioned constitutional violations.  The individual defendants were acting in conformity with what appears to be a widespread custom or practice of failing to provide appropriate and non-discriminatory services to domestic violence victims such as Pamela and Cindy.  This failure was deliberately indifferent to the obvious risks to a domestic violence victim in coming forward and reporting abuse.  Therefore,

Fresno law enforcement frequently did not comply with the laws intended to protect domestic violence victims, and this pattern of conduct is sufficient evidence of an illicit custom or practice. See *Price v. Sery*, 513 F.3d 962, 973-974 (9th Cir. 2008) (evidence of how law enforcement handles calls in practice can overcome evidence of an appropriate written policy).  These same illicit customs and practices also resulted in Pamela's and Cindy's being subjected to state-created danger.  As a direct and proximate result of these offending customs and practices of Fresno, Pamela and Cindy were damaged as alleged hereinabove.

68.      Accordingly, Fresno and the named individual defendants are responsible for the lax and offensive services provided to Pamela and Cindy, who are in a class of domestic violence victims who are overwhelmingly female.  These defendants are therefore liable for Pamela's and Cindy's constitutional rights being violated and the damages caused as a result.  The individual defendants' violation of the plaintiff's rights were in conscious disregard of those rights and also subject them to punitive damages.

SECOND CLAIM FOR RELIEF

42 U.S.C. § 1983 – Deprivation of Rights to Familial Association/Relations

(By Plaintiffs Yvette Caldera, Valerie Caldera and Danny Rice Against All Defendants)

69.      Plaintiffs re-allege and incorporate by reference paragraphs 1 through 68, as though fully set forth herein.

70.      The named defendants each violated Yvette Caldera's, Valerie Caldera's, and Danny Rice's constitutional rights by committing the misconduct set forth hereinabove in Claim for Relief One.

71.      As a direct and proximate result of the aforementioned customs, policies  and/or practices of Fresno,  Yvette Caldera, Valerie Caldera, and Danny Rice were deprived of their beloved

mother and suffered the injuries and damages as alleged hereinabove.   The liberty interests of these plaintiffs are well-recognized as 14th Amendment substantive due process rights.

72.     The aforementioned misconduct of the named individual defendants was of such an egregious nature that it entitles these plaintiffs to an award of exemplary and punitive damages according to proof and as permitted by law.

### THIRD CLAIM FOR RELIEF

### 28 U.S.C. § 2201- Declaratory Relief

### (By All Plaintiffs Against Defendant City of Fresno)

73.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 72, as though fully set forth herein.

74.     The foregoing factual allegations set forth an actual controversy with respect to whether plaintiffs' constitutional equal protection and substantive due process rights were violated. Therefore, this proceeding is an appropriate one for declaratory relief under 28 U.S.C. § 2201.

75.     Because of the irreparable harm Fresno victims of gender-based violence continue to face, plaintiffs requests declaratory and injunctive relief requiring Fresno to address the clear deficits in its enforcement of laws protecting women from violence and also the revictimization of such women.

76.     Plaintiffs also request further necessary and proper relief as provided for under 28 U.S.C. § 2202, as may be determined by the Court.

///

///

///

## FOURTH CLAIM FOR RELIEF

### Negligence

(By Plaintiffs Pamela Motley and the Estate of Cindy Raygoza Against All Defendants)

77.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 76, as though fully set forth herein.

78.     The defendants each had a duty to care to perform their duties, whether ministerial, supervisory or administrative, in a non-negligent manner, and, by committing the misconduct alleged above, each named defendant breached that duty.  Specifically, the individual defendants were, at minimum, negligent in failing to take reasonable steps to arrest Pamela's and Cindy's abusers when their arrests were mandatory under state law.  Fresno was also negligent in effectuating and ensuring the full enforcement of the Violence Against Women Act and in permitting women such as Pamela and Cindy to be revictimized by its officers.

79.     These negligent failures resulted in Pamela's and Cindy's being damaged as alleged hereinabove.

## FIFTH CLAIM FOR RELIEF

### Wrongful Death

(California Code of Civil Procedure 377.60 et seq.)

(By Plaintiffs Yvette Caldera, Valerie Caldera and Danny Rice Against All Defendants)

80.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 79, as though fully set forth herein.

81.      Each of the defendants committed intentional or negligent misconduct that caused Cindy's untimely and wrongful death.

82.     As a direct and proximate result of this misconduct, the Yvette Caldera, Valerie Caldera, and Danny Rice suffered the injuries and damages as alleged hereinabove

83.     These injuries and damages are compensable under California law.

SIXTH CLAIM FOR RELIEF

Injunctive and Declaratory Relief - Code of Civil Procedure § 526, 1060

(By All Plaintiffs Against Defendant City of Fresno)

84.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 83, as though fully set forth herein.

85.     The foregoing factual allegations set forth an actual controversy with respect to whether plaintiffs' constitutional equal protection and substantive due process rights were violated. Therefore, this proceeding is an appropriate one for declaratory relief under California law.

86.     Because of the irreparable harm Fresno victims of gender-based violence continue to face, plaintiffs requests declaratory and injunctive relief requiring Fresno to address the clear deficits in its enforcement of laws protecting women from violence and also the revictimization of such women.

87.     Plaintiffs also request further necessary and proper relief, as may be determined by the Court.

88.     Plaintiffs also requests further necessary and proper relief as provided for under Code of Civil Procedure §§ 526 and 1060 and is entitled to attorney's fees under Code of Civil Procedure § 1021.5.

///

///

///

PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

1.       For compensatory, general and special damages against each defendant in an amount proven at trial;

2.       For punitive and exemplary damages against each named individual defendants, in an amount appropriate to punish them and deter others from engaging in similar misconduct;

3.       For statutory damages and penalties;

4.       For costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988, and as otherwise authorized by statute or law;

5.       For such other relief, including the above-requested injunctive and declaratory relief, as the Court may deem proper.

DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury as to all their claims for relief seeking legal remedies.

Dated: June 14, 2015

_____
Kevin G. Little
Attorney for Plaintiffs Pamela Motley, Estate of Cindy Raygoza, Yvette Caldera, Valerie Caldera, and Danny Rice