1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   PAMELA MOTLEY; ESTATE OF                No.  1:15-cv-00905
     CINDY RAYGOZA, through its legal
12   representative and administrator, YVETTE
     CALDERA; YVETTE CALDERA;
13   VALERIE CALDERA; DANNY RICE,            ORDER GRANTING IN PART AND
                                             DENYING IN PART DEFENDANTS'
14                    Plaintiffs,            MOTION TO DISMISS

15          v.                               (Doc. No. 11)

16   JOSEPH SMITH; BRIAN LITTLE;
     DERRICK JOHNSON; MICHAEL
17   COUTO; BERNARD FINLEY; BYRON
     URTON; UNKNOWN FRESNO POLICE
18   OFFICES; THE CITY OF FRESNO,
     CALIFORNIA,
19
                      Defendants.
20

21

22          On June 14, 2015, Pamela Motley ("Pamela") and the Estate of Cindy Raygoza ("Cindy")

23   (collectively, "plaintiffs"), by and through its legal representative and administrator, filed a

24   complaint against the City of Fresno ("Fresno") and Fresno Police Department ("FPD") officers

25   Joseph Smith, Brian Little, Derrick Johnson, Michael Couto, Bernard Finley, Byron Urton, and an

26   unnamed officer (collectively, the "defendant officers").  (Doc. No. 1.)  Cindy's adult children—

27   Yvette Caldera, Valeria Caldera, and Danny Rice—have filed their own claims in this action as

28   well, seeking relief for deprivation of rights to familial association under 42 U.S.C. § 1983 and

                                                 1

wrongful death under California Code of Civil Procedure §§ 377.60 *et seq.*   Pamela and Cindy filed a first amended complaint ("FAC") on June 17, 2015.  (Doc. No. 7.)  Defendant Fresno filed a motion to dismiss on July 10, 2015.  (Doc. No. 11.)  The defendant officers joined in the motion to dismiss on July 27, 2015.  (Doc. No. 19.)  Plaintiffs filed an opposition on August 15, 2015.  (Doc. No. 20.)  On August 20, 2015, defendants filed a reply.  (Doc. No. 24.)  The motion to dismiss was first taken under submission on August 20, 2015 by District Judge Troy L. Nunley.  However, the case was subsequently transferred to District Judge Dale A. Drozd on February 29, 2016.  (Doc. No. 37.)  Thereafter oral argument was heard with respect to the pending motion on May 3, 2016.  (Doc. No. 43.)  Attorney Kevin Little appeared on behalf of the plaintiffs and attorney Tony Sang appeared on behalf of the defendants.

**I.   Introduction**

In their FAC, plaintiffs together allege multiple federal and state law causes of action against both the defendant officers and Fresno.  However, though combined in a single complaint and alleging shared causes of action, the only common nexus uniting plaintiffs' claims is that both plaintiffs dealt with the FPD after suffering domestic violence.  There is no overlap—at least as currently pled—between the defendant officers who interacted with each plaintiff.  Thus, the facts of each plaintiff's claims must be laid out separately.

*a.  Pamela Motley*

Pamela is a victim of domestic violence.  In January 2014, Pamela discovered her husband, Paul Motley ("Paul"), was having an affair with another woman and arranged for a meeting between herself, her husband, and the other woman in a public space.  The meeting ended with Paul striking the other woman and being arrested.  Upon his release, Paul was involuntarily held pursuant to California Welfare and Institutions Code § 5150.  Pamela subsequently moved out of the house she shared with Paul and moved in with her parents in Fresno.

Pamela and Paul attempted to reconcile their relationship, but by March 2014, Pamela announced she wanted to divorce Paul.  In response, Paul attacked and injured Pamela on March 12, 2014.  Pamela called the police on March 13, 2014, but the police did not respond until March

2

14, 2014.  On that day, Officers Smith and Little met with Pamela.  According to Pamela, the officers did not inform her of citizen's arrest rights, or give her any of the informational materials with which domestic violence victims must be provided under California law.  Officers Smith and Little also interviewed Paul and served him with an emergency protective order issued by a judge of the Fresno County Superior Court.  According to Pamela, Officers Smith and Little failed to arrest Paul in spite of his admission he had physically grabbed Pamela and even though Paul failed to surrender his firearm, as required by California Welfare and Institutions Code § 5150.  An arrest did not take place despite Paul's admission because the officers determined the March 12, 2014 incident involved mutual combat.  Four days after meeting with Officers Smith and Little, Pamela obtained a domestic violence restraining order against Paul.

Nonetheless, Paul continued to threaten, stalk, and harass Pamela.  Paul went to Pamela's place of work on March 24, 2014, prompting Pamela to call the FPD.  Officers Johnson and Couto responded to the call.  Even though Paul was present upon their arrival, the officers could not arrest Paul because he had not yet been served with the restraining order procured by Pamela on March 18, 2014.  The officers then served Paul with the restraining order.  According to Pamela, those officers also failed to inform her of her citizen's arrest rights or provide her with the required domestic violence victim information.

On the morning of March 25, 2014, Pamela called the FPD to report Paul had deflated her tires and was continuing to text and call her in violation of the restraining order.  There was no immediate response by the FPD, and Pamela called again later that day.  By the evening of March 25, 2014, Officer Finley responded to Pamela's's call.  Officer Finley confirmed Paul had called and texted Pamela and also confirmed the existence of the restraining order.  Officer Finley then reportedly visited Paul's address to try and contact him, but was apparently unable to find him.  Pamela alleges Officer Finley also failed to provide her with the required domestic violence victim information or inform her of her citizen's arrest rights.

On March 28, 2014, Pamela called the FPD to report she had heard from a third party that Paul had threatened to kill her and her parents.  Before any officer responded, Pamela left to stay with her daughter in Kerman, California.  The FPD canceled the officer response.  Pamela alleges

3

there was nothing to prevent an FPD officer from coming to Kerman to take her statement.

Pamela alleges Paul made a court appearance at Fresno County Superior Court on April 3, 2014.  Pamela also alleges that if any of the above-named officers had sought or obtained an arrest warrant for Paul, he would have been taken into custody during this court appearance.

On April 7, 2014, Pamela again called the FPD after Paul followed her while she was driving, eventually blocking her in at a cul-de-sac with his car.  While Pamela was trapped in the cul-de-sac, Paul threatened to kill her on their wedding anniversary:  April 14, 2014.  Officer Urton responded to this call from Pamela.  According to Pamela, Officer Urton was "rude and insensitive" and told her not to worry because "[t]hese guys follow through only 1 percent of the time." (Doc. No. 7, Complaint ("Compl.") at 12.)  Pamela alleges the only action Officer Urton took was to try and contact Paul at his address.  Pamela also alleges Officer Urton failed to provide her with the requisite domestic violence victim information or inform her of her citizen's arrest rights.

On April 12, 2014, after lying in wait outside of Pamela's parents' house, Paul ambushed Pamela and shot her in her face as she returned home from work.  Paul then killed himself.  Pamela is now a paraplegic as a result of the attack.  She alleges the above-named officers caused her injuries by failing to properly investigate her complaints against Paul.  According to Pamela, a proper investigation would have resulted in Paul's arrest, preventing him from inflicting harm upon her.

   b.  *Cindy Raygoza*

Cindy Raygoza alleges she was attacked by her ex-boyfriend, Michael Reams ("Michael"), one evening in February 2014.  Michael broke into Cindy's apartment and choked her.  Cindy had managed to call the FPD as Michael was breaking in, but Michael was able to escape before the FPD responded.  The responding FPD officer—whose name is currently unknown to plaintiffs—performed a background check on Michael and learned he had been previously arrested for domestic violence.  Cindy explained to the unnamed officer she was a domestic violence survivor, having been abused by her previous husband. According to Cindy, /////

1  the unnamed officer proceeded to berate Cindy about her choice in men.[1]  The unnamed officer

2  also told Cindy if she continued to associate with Michael the FPD would not respond to her calls

3  and would consider her to be "crying wolf." (*Id.* at 15.)  Cindy also alleges this officer promised

4  that he (or she) would arrest Michael.

5         The complaint alleges Michael was never arrested, and the FPD made no concerted effort

6  to adhere to the officer's promise.  Instead, Michael broke into Cindy's apartment again on July

7  14, 2014 and stabbed Cindy to death.  According to the complaint, Cindy's death would have

8  been avoided had the FPD arrested Michael following his first attack on Cindy.  The complaint

9  also alleges that the unnamed FPD officer failed to provide Cindy with the requisite domestic

10  violence victim information and inform her of her citizen's arrest rights.

11         c.  *Non-party Victims*[2]

12         Plaintiffs also include multiple allegations concerning non-party victims.  These

13  allegations describe instances in which FPD officers failed to follow proper procedures when

14  responding to domestic violence calls, such as interviewing the victim and aggressor in presence

15  of one another; discounting the testimony of female victims in favor of male aggressors; and

16  making insensitive remarks to female victims, including telling one female who was raped by her

17  boyfriend that she was not "acting like a rape victim."  Plaintiffs also allege female domestic

18  violence victims were misinformed about the legal protections to which they were entitled.

19  Lastly, plaintiffs allege Jerry Dyer, the chief of the FPD, admitted at a press conference there

20  were officers in his department "who just do not get it" when it comes to domestic violence.

21  /////

22

23  [1]  The complaint alleges Yvette Caldera, the current administrator of Cindy's estate, was present
24  when Cindy told the unnamed officer she was a domestic violence survivor and he (or she)
    berated Cindy.

25  [2]  Defendants seek to strike the paragraphs containing these allegations from the FAC.  Federal
26  Rule of Civil Procedure 12(f) states that "[t]he court may strike from a pleading an insufficient
    defense or any redundant, immaterial, impertinent, or scandalous matter."  Defendants claim
27  these paragraphs contain nothing more than "argumentative surplusage."  (Doc. No. 11, Motion to
    Dismiss ("MTD") at 19–20.)  The court disagrees.  As will be discussed below, the allegations in
28  question are material to plaintiffs' *Monell* claims.

5

**II.    Legal Standard**

The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test the legal sufficiency of the complaint. *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983). "Dismissal can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). A plaintiff is required to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In determining whether a complaint states a claim on which relief may be granted, the court accepts as true the allegations in the complaint and construes the allegations in the light most favorable to the plaintiff. *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984); *Love v. United States*, 915 F.2d 1242, 1245 (9th Cir. 1989). It is inappropriate to assume that the plaintiff "can prove facts which it has not alleged or that the defendants have violated the . . . laws in ways that have not been alleged." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983).

In ruling on a motion to dismiss brought pursuant to Rule 12(b)(6), the court is permitted to consider material which is properly submitted as part of the complaint, documents that are not physically attached to the complaint if their authenticity is not contested and the plaintiff's complaint necessarily relies on them, and matters of public record. *Lee v. City of Los Angeles*, 250 F.3d 668, 688–89 (9th Cir. 2001).

**III.    Analysis**

**a.    42 U.S.C. § 1983 Claims**

Section 1983 provides, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the

1

2

Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

3    The statute does not serve as an independent source of substantive rights; rather it provides "a

4    method for vindicating federal rights elsewhere conferred." *Baker v. McCollan*, 443 U.S. 137,

5    144 n.3 (1979). Thus, "[t]o state a claim under § 1983, a plaintiff must allege the violation of a

6    right secured by the Constitution and laws of the United States, and must show that the alleged

7    deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S.

8    42, 48 (1988).

9         Plaintiffs contend the defendant officers deprived them of their substantive due process

10   and equal protection rights under the Fourteenth Amendment. Plaintiffs also allege a municipal

11   liability claim brought pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

12   The court will first examine whether plaintiffs have adequately pled a § 1983 claim against the

13   defendant officers before turning to an examination of the sufficiency of their *Monell* claim.

14                    *i.  Due-Process Violation*

15        "[A] State's failure to protect an individual against private violence simply does not

16   constitute a violation of the Due Process Clause." *DeShaney v. Winnebago Cty. Dep't of Soc.*

17   *Servs.*, 489 U.S. 189, 197 (1989). This is because the purpose of the Due Process Clause is "to

18   protect the people from the State, not to ensure that the State protect[s] them from each other."

19   *Id.* at 196. Therefore, an individual cannot sue a state actor solely on the grounds that his life,

20   liberty, or property interests were harmed as a result of the state actor's failure to protect him

21   from the conduct of a third party. *Johnson v. City of Seattle*, 474 F.3d 634, 639 (9th Cir. 2007)

22   ("Because the City of Seattle had no constitutional duty to protect the Pioneer Square Plaintiffs

23   against violence from members of the riotous crowd, 'its failure to do so-though calamitous in

24   hindsight-simply does not constitute a violation of the Due Process Clause.'") (quoting

25   *DeShaney*, 489 U.S. at 202).

26        However, two exceptions to this general rule exist. The first exception—"danger

27   creation"—provides that a government official may be liable under § 1983 if "state action

28   affirmatively . . . creates or exposes an individual to a danger which he or she would not have

7

1    otherwise faced." *Id*. (citations and internal quotation marks omitted).  Under this exception, the

2    plaintiff must also allege and ultimately show "that the [government] official . . . acted with

3    deliberate indifference to [a] known or obvious danger." *L.W. v. Grubbs,* 92 F.3d 894, 900 (9th

4    Cir. 1996).  "'Deliberate indifference' is a stringent standard of fault, requiring proof that a

5    municipal actor disregarded a known or obvious consequence of his actions." *Kennedy v. City of*

6    *Ridgefield*, 439 F.3d 1055, 1064 (9th Cir. 2006).  The second exception—"special relationship"—

7    creates liability "when a custodial relationship exists between the plaintiff and the State such that

8    the State assumes some responsibility for the plaintiff's safety and well-being." *Henry A. v.*

9    *Willden*, 678 F.3d 991, 1002 (9th Cir. 2012).

10       Plaintiffs argue the special relationship exception applies in Pamela's case because an

11    officer defendant—Officer Urton—knew Paul had threatened to kill Pamela on April 14, 2014,

12    creating a situation in which the state was aware of a specific risk of harm to her.  (Doc. No. 20,

13    Plaintiffs' Opposition ("Opp.") at 8.)  Second, plaintiffs argue the "danger creation" exception

14    applies to Cindy's case because an unnamed officer, by making revicitimizing statements to

15    Cindy, discouraged her from calling 9-1-1 for help.  (*Id*.)  In response, defendants argue these

16    exceptions are applicable only to situations in which officers affirmatively create a danger that

17    did not previously exist, whereas in the current action, Pamela and Cindy were harmed by a pre-

18    existing danger from a private actor.  (Doc. No. 24, Defendants' Reply ("Reply") at 7–11.)  The

19    application of each exception will be analyzed below in turn.

20            *1.  Does the "special relationship" exception apply to Pamela*?

21       "[The] 'special relationship exception' [applies] when 'the State takes a person into its

22    custody and holds him there *against his will*.'" *Campbell v. State of Washington Dep't of Soc. &*

23    *Health Servs.*, 671 F.3d 837, 842 (9th Cir. 2011) (quoting *DeShaney*, 489 U.S. at 199–200).  By

24    so limiting an individual's freedom, "the state has a duty to 'assume some responsibility for [the

25    person's] safety and general well-being' because it has 'render[ed] him unable to care for

26    himself.'" *Id*. at 843 (quoting *DeShaney*, 489 U.S. at 200).  A state's "knowledge of [a

27    plaintiff's] plight and its expressions of intent to help"—absent some type of state imposed

28    limitation on that plaintiff's freedom—is not enough to give rise to the exception. *Balistreri v.*

1   *Pacifica Police Dep't*, 901 F.2d 696, 700 (9th Cir. 1990).

2          Here, plaintiffs have not adequately pled the existence of a "special relationship" between

3   Pamela and the defendant officers.  The decision in *Balistreri* is instructive.  In that case, Jena

4   Balistreri—a domestic violence victim—filed a § 1983 complaint against a police department and

5   its chief after she was severely abused by her husband over an extended period of time.  *Id*. at

6   698.  Balistreri argued the police violated her constitutional rights because, even after multiple

7   calls for assistance and the issuance of a restraining order, they refused to arrest her husband

8   despite overwhelming evidence of his ongoing abuse and harassment of her.  *Id*.  The district

9   court dismissed the suit for failure to state a claim, and Balistreri appealed, arguing she could

10   sustain a § 1983 action because the police "knew of her plight and affirmatively committed to

11   protect her [as a result of the restraining order]," thus giving rise to a special relationship.  *Id*. at

12   700.  The Ninth Circuit rejected this argument, noting her allegations regarding the police

13   department's knowledge were, even if proven, not enough to establish the existence of a special

14   relationship as recognized by the law.  Rather, Balistreri needed to allege and ultimately show she

15   was subjected to some form of state control that limited her freedom to act for herself.  *Id*. (citing

16   *DeShaney*, 489 U.S. at 199–200).

17          Just as in *Balistreri*, Pamela here attempts to use the defendant officers' knowledge—in

18   particular Officer Urton's knowledge—of her plight as grounds for establishing a special

19   relationship.  But noticeably absent from plaintiffs' FAC are any allegations that Pamela was

20   taken into any sort of custody by the defendant officers or the FPD that rendered her unable to

21   care for herself.  Thus, the allegations of plaintiffs' complaint are insufficient with respect to the

22   existence of the required special relationship.

23              *2.   Does the "danger creation" exception apply to Cindy?*

24          The "danger creation" exception applies to situations in which "state action . . . creates or

25   exposes an individual to a danger which he or she would not have otherwise faced."  *Kennedy*,

26   439 F.3d at 1062.  A state actor cannot be held liable for failing to mitigate an already existing

27   dangerous situation not instigated by state action.  *See Johnson*, 474 F.3d at 641 (police not liable

28   for failing to protect revelers because the police conduct did not enhance danger inherent to those

1 participating in Mardi Gras celebration).  The individual must allege and ultimately show

2 "officers left [him or her] in a situation that was more dangerous than the one in which they found

3 him." *Munger v. City of Glasgow Police*, 227 F.3d 1082, 1086 (9th Cir. 2000).

4   The Ninth Circuit has provided guidance for the application of this exception.  In *Munger*,

5 the court held the danger creation exception applied when police officers knowingly forced a

6 heavily intoxicated bar patron—wearing only jeans and a t-shirt—into subfreezing temperatures,

7 causing him to die from hypothermia.  *Id*. at 1087.

8   The holding in *Munger* was in part premised on the decision in *Wood v. Ostrander*, 879

9 F.2d 583 (9th Cir. 1989), the progenitor of the danger creation exception in the Ninth Circuit.

10 *Wood* involved a police officer's decision to abandon a young woman in a high crime area.  *Id*. at

11 586.  The young woman—a passenger in a car which was impounded after the driver was

12 arrested—was subsequently raped as she tried to hitchhike home.  *Id*.  In overturning a district

13 court's grant of summary judgment in favor of the defendant police officer, the Ninth Circuit in

14 *Wood* noted "[t]he fact that [the officer] arrested [the driver], impounded his car, and apparently

15 stranded [the young woman] in a high-crime area at 2:30 a.m. distinguishe[d] [the young woman]

16 from the general public and trigger[ed] a duty of the police to afford her some measure of peace

17 and safety." *Id*. at 590.

18   The Ninth Circuit's holding in *L.W. v. Grubbs*, further elaborates on the proper application

19 of the danger creation doctrine.  In that case L.W. was a registered nurse who worked in a

20 medium security custodial institution for young male offenders.  974 F.2d at 120.  L.W. sued her

21 supervisors, who were state employees, after she was raped by an inmate.  *Id*.  L.W. claimed her

22 supervisors had promised she would not be required to work alone with violent offenders, but,

23 contrary to this promise, her supervisors placed her in a position in which she was placed alone

24 with a violent sexual offender.  *Id*.  L.W. argued her supervisors violated her substantive due

25 process rights by putting her in a perilous situation, and the Ninth Circuit agreed, noting "[t]he

26 [d]efendants . . . used their authority as state correctional officers to create an opportunity for [the

27 inmate] to assault L.W. *that would not otherwise have existed*." *Id*. at 121 (emphasis added).

28 /////

Finally, the decision in *Kennedy v. City of Ridgefield* provides additional guidance.  In that case, Kennedy called her local police department, complaining that a thirteen year-old neighborhood boy—Michael Burns—had molested her daughter.  439 F.3d at 1057.  During her initial meeting with the police, Kennedy warned a police officer of Michael's violent proclivities, and in response, the officer promised Kennedy he would forewarn her before the police contacted Michael.  *Id.* at 1057–58.  Despite this promise, the officer later met with Michael and his mother to discuss the allegations without warning Kennedy.  *Id.* at 1058.  When the police officer subsequently told Kennedy about the meeting, she told the officer she feared for her safety.  *Id.* In response, the police officer assured her the police would provide extra patrols around her house that evening, and based on this promise, Kennedy and her family decided to remain in their home for the night.  *Id.*  However, that same evening, Michael broke into Kennedy's home and shot Kennedy and her husband, severely wounding her and killing her husband.  *Id.*  The Ninth Circuit held the officer violated Kennedy's constitutional rights under the danger creation exception because he "affirmatively created an actual, particularized danger Kennedy would not otherwise have faced."  *Id.* at 1063.  Not only did the defendant officer trigger the event by meeting with Michael without warning Kennedy as promised, he also increased the danger they faced with his "misrepresentation as to the risk the Kennedys faced . . . ."  *Id.*

Plaintiffs argue the unknown officer's revictimizing statements—i.e., telling Cindy she would be regarded as "crying wolf" if she remained with Michael—exposed Cindy to a state created danger that otherwise would not have existed.  They claim the statement deterred Cindy from seeking help from the police, and, absent the statement, Cindy would have been more prompt in calling 9-1-1 on the night Michael fatally stabbed her.  The court finds that this alleged conduct by the officer—while callous and improper—does not constitute state-created danger in that its alleged deterrent effect is entirely subjective.  The unnamed officer did not threaten action against Cindy for seeking assistance from the police.  *See Watson v. City of Kansas*, 857 F.2d 690, 692 (10th Cir. 1988) (noting that police captain told domestic violence victim that if she "ever call[ed] the police again, [he would] see to it that [she was] arrested and [would] never see [her] two kids again.").  Nor did the statements put Cindy in proximity with Michael, c*f. Grubbs*,

974 F.2d at 121, or contain a promise of protection or safety giving rise to a false sense of security, *cf. Kennedy*, 439 F.3d at 1058.  Rather, it was Cindy's alleged construal of the offensive statement—and not an objective promise or threat—that transformed the words into allegedly obstructing her from seeking help.  Allowing a plaintiff to bring a state-created danger claim based only on his or her personal reaction to insulting language or an offensive statement would result in an unwieldy subjective analysis.  Absent allegation of some objective indication that the unnamed officer's statements put Cindy in a dangerous situation, Cindy's substantive due process claim will be dismissed with leave to amend.

### ii.  Equal Protection

"The Equal Protection Clause of the Fourteenth Amendment commands that no state shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985).  In order to state a claim under § 1983 for "a violation of the Equal Protection Clause of the Fourteenth Amendment a plaintiff must show that the defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class." *Lee v. City of Los Angeles*, 250 F.3d 668, 686 (9th Cir. 2001) (citing *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998)).  "Intentional discrimination means that a defendant acted at least in part because of a plaintiff's protected status." *Maynard v. City of San Jose*, 37 F.3d 1396, 1404 (9th Cir. 1994).

The denial of police protection to disfavored persons stemming from discriminatory intent or motive violates the Equal Protection Clause. *Estate of Macias v. Ihde*, 219 F.3d 1018 (9th Cir. 2000).  However, "in police failure-to-serve cases, the courts consistently have required more evidence of discriminatory intent than a simple failure of diligence, perception, or persistence in a single case involving [members of a protected class]." *Moua v. City of Chico*, 324 F. Supp. 2d 1132, 1140 (E.D. Cal. 2004).

Here, plaintiffs claim the police failed to conduct proper investigations; failed to provide them with domestic violence information, the provision of which is mandated by law; failed to enforce California law regarding criminal threats, stalking, and intentional and knowing

12

1    violations of restraining orders; and treated them with disdain and disrespect because of their

2    status as female victims of domestic violence.[3]  (FAC at ¶¶ 20–49.)

3          In their FAC, plaintiffs do not present separate equal protection claims.  However,

4    because plaintiffs allege § 1983 claims against individual defendant officers, and because the

5    plaintiffs share no factual nexus of facts, this court must examine whether each plaintiff can

6    individually establish a claim against the individual defendant officers with whom they interacted.

7                  *1.  Pamela's Equal Protection Claims against Officers Smith, Little,*

8                        *Johnson, Couto, Finley, and Urton*

9          Pamela has failed to state a cognizable gender-discrimination claim against any of the

10   individual defendant officers.  Pamela's claim is predicated entirely on her allegedly poor

11   treatment by police because of her status as a victim of domestic violence.  However, "[t]he

12   custom of according different treatment to victims of domestic violence is gender-neutral on its

13   face."  *Navarro*, 72 F.3d at 716.  This is not to say Pamela is foreclosed from alleging the officers

---

[3]  In their complaint, plaintiffs allege the police "den[ied Pamela and Cindy] the equal protection of the laws protecting women from gender-based violence."  (FAC at ¶ 64.)  Plaintiffs also claim that "[l]aw enforcement's lax or offensive actions in handling domestic violence cases are indicative of discriminatory intent."  (*Id*. at ¶ 65.)  These statements, while not contradictory, do muddy plaintiffs' allegations because classification by gender as well as by domestic violence victim/non-domestic violence victim have both been relied upon as grounds for establishing a cognizable equal protection claim.  *See Navarro v. Block*, 72 F.3d 712, 716-17 (9th Cir. 1995) (holding plaintiffs could pursue equal protection claim on grounds that police denied them protection because of their status as a domestic violence victim); *Balistreri*, 901 F.2d at 701 (9th Cir. 1990) (holding plaintiff could pursue an equal protection claim on grounds that police denied her protection because of her gender).  At the hearing on the pending motion, plaintiffs' counsel argued that gender discrimination and discrimination based on an individual's status as a victim of domestic violence are different sides of the same coin.  The court disagrees.  *See Navarro*, 72 F.3d at 716.  Upon reviewing the complaint, as well as plaintiffs' opposition to defendants' motion to dismiss, the court finds that plaintiffs here have alleged an equal protection claim based on gender discrimination.  (*See* FAC at ¶ 64 ("At all relevant times . . . each of the individual defendants intentionally discriminated against women, and, in particular, women who are victims of gender-based violence.")).  As pled, plaintiffs' complaint alleges a claim that women are not afforded full protection of the law—including gender-neutral laws designed to protect domestic violence victims—because of their gender.  If plaintiffs wish to allege the defendants discriminated against them because of their status as domestic violence victims, they must allege and point to a policy or practice of defendants by which domestic violence victims were treated differently from non-domestic violence victims.  *See Navarro*, 72 F.3d at 716 (asserting an equal protection claim on basis that police department classified domestic violence calls as non-emergencies).

of the FPD discriminated against female domestic violence victims. "[I]t is well established that discriminatory application of a facially neutral law also offends the Constitution." *Id*. (citing *Yick Wo v. Hopkins*, 118 U.S. 356, 362–63 (1886)). But Pamela is not permitted to construct a gender-discrimination claim by pointing only to instances in which FPD officers failed to afford her the rights and protections offered to all domestic violence victims in California, regardless of gender. Instead, she must allege and ultimately prove that she was denied these rights and protections in part because an "animus against her because [of her gender]." *Id*.; *see also Balistreri*, 901 F.2d at 701–02 (finding that a cognizable gender discrimination claim could be brought by a domestic violence victim where the victim alleged the denial of police protection accompanied by misogynistic comments). The complaint now before the court contains no such allegations pertaining to Pamela's treatment by the above-named officers. It is not alleged that any of the defendant officers made comments or behaved in such a manner that would allow this court to reasonably infer their actions were motivated by gender animus. Accordingly, Pamela's equal protection claim will be dismissed with leave to amend.

### 2. Cindy's Equal Protection Claim against the Unnamed Officer

Unlike Pamela, Cindy alleges facts allowing this court to draw a reasonable inference that the unnamed officer's denial of equal police protection was motivated, at least in part, by gender-animus. The unnamed officer's decision to allegedly berate Cindy and to blame her abuse on her choice of men is tantamount to the misogynistic comments uttered by the police officer in *Balistreri*. *See* 901 F.2d at 701. (leave to amend should have been granted where it was alleged that the police officer told a female domestic violence victim "he did not blame [the victim's] husband for hitting her, because of the way she was 'carrying on.'").

Defendants argue that for statements to be indicative of gender animus, they must reference the subject's gender or race. However, the statement in *Balistreri*, outside of referencing the victim's husband, did not refer to the victim's gender. Accordingly, the court finds no basis upon which to conclude as a matter of law that alleged statements cannot be indicative of animus unless they contain gender-specific vulgarities. The unknown officer's comments alleged here are misogynistic because, just like the officer's comments in *Balistreri*,

14

they speak to a belief that women, through their personal choices, somehow become more deserving of becoming victims of domestic abuse. These allegations are sufficient to state a cognizable equal protection claim. Defendants' motion to dismiss Cindy's equal protection claim will therefore be denied.

### iii.   Monell Liability

Municipalities "may not be held vicariously liable for the unconstitutional acts of its employees under the theory of *respondeat superior*." *Gillette v. Delmore*, 979 F.2d 1342, 1348 (9th Cir. 1992). Rather, for a municipality to be subject to damages liability under § 1983, a plaintiff must allege and ultimately show an official municipal policy caused his or her constitutional deprivation. *Monell*, 436 U.S. at 691. "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 60 (2011). As the Ninth Circuit has stated:

> To impose liability on a local governmental entity for failing to act to preserve constitutional rights, a [§] 1983 plaintiff must establish: (1) that he possessed a constitutional right of which he was deprived; (2) that the municipality had a policy; (3) that this policy "amounts to deliberate indifference' to the plaintiff's constitutional right; and (4) that the policy is the 'moving force behind the constitutional violation."

*Oviat by and through Waugh v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992) (quoting *City of Canton v. Harris,* 489 U.S. 378, 389-91 (1989)).

Here, in their complaint, plaintiffs allege "[t]he individual defendants [in depriving plaintiffs of their constitutional rights] were acting in conformity with what appears to be a widespread custom or practice of failing to provide appropriate and non-discriminatory services to domestic violence victims . . . ." (FAC at ¶ 67.) In other words, plaintiffs claim the FPD had a longstanding practice or custom of denying female victims of domestic violence equal protection under the law. Also, because Cindy is the only plaintiff to allege a cognizable equal protection claim at this time, she is the only plaintiff who can now maintain a cognizable *Monell* claim against Fresno. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental

1    regulations might have *authorized* the use of constitutionally excessive force is quite beside the

2    point."). Therefore, Pamela's *Monell* claim will be dismissed with leave to amend granted.

3        "[A] municipality may be sued for 'constitutional deprivations visited pursuant to

4    governmental custom even though such custom has not received formal approval through the

5    [governmental] body's official decision making channels.'" *Navarro*, 72 F.3d at 714 (citing

6    *Monell*, 436 U.S. at 690–91). "Liability for improper custom may not be predicated on isolated

7    or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and

8    consistency that the conduct has become a traditional method of carrying out policy." *Trevino v.*

9    *Gates*, 99 F.3d 911, 918 (9th Cir. 1996). The Ninth Circuit has held that proof of two previous

10   unconstitutional acts by individuals acting under color of state law is insufficient to establish

11   municipal liability. *Meehan v. Cty. of Los Angeles*, 856 F.2d 102, 107 (9th Cir. 1988).

12       Here, plaintiffs' complaint points to multiple incidents suggesting the existence of a

13   custom or practice of denying police protection to abused women because of their gender. (FAC

14   ¶¶ 50–62.) Plaintiffs allege that as far back as 2008, the FPD has denied female domestic abuse

15   victims full police protection. (FAC at ¶ 57.) Plaintiffs have also provided multiple examples in

16   which FPD officers failed to follow simple protocol while carrying out a domestic violence

17   investigation. For example, according to plaintiffs, FPD officers failed to properly conduct

18   investigatory interviews, interviewing the male abuser before speaking with the female abuse

19   victim. (FAC at ¶ 57–58). Plaintiffs also allege FPD officers engaged in a practice of failing to

20   document signs of abuse, such as refusing to photograph injuries or treating injuries as self-

21   inflicted. (FAC at ¶¶ 51, 53, 54, 56). These instances, coupled with plaintiffs' allegations that

22   FPD officers made misogynistic comments to them, including telling a victim of domestic rape

23   that she was not "acting like a rape victim," FAC at ¶ 51, are a sufficient basis, if proven, upon

24   which to reasonably infer the FPD had a custom or practice of denying female domestic violence

25   victims equal police protection because of their gender. That is all that is required. Accordingly,

26   defendants' motion to dismiss plaintiffs' *Monell* claim will be denied.

27   /////

28   /////

16

### b. State Law Negligence/Wrongful Death Claims

Plaintiffs generally allege "the defendants had a duty to care [sic] to perform their duties, whether ministerial, supervisory or administrative, in a non-negligent manner, and, by committing the misconduct alleged above, each named defendant breached the duty."[4]  (FAC ¶ 78.)  Plaintiffs do not delineate the specific conduct constituting defendants' negligent acts.  However, the court groups defendants' allegedly negligent conduct as follows:  (1) failure to arrest Paul; (2) failure to seek an arrest warrant or issue an All-Points Bulletin or otherwise direct the application of police resources towards the arrest of Michael or Paul; (3) failure to provide domestic violence information to Pamela and Cindy; (4) failure on the part of Fresno to enforce the Violence Against Women Act ("VAWA"); and (5) revictimizing statements made to Cindy.

### i. *Did the individual defendants owe Pamela or Cindy a duty of care?*[5]

As noted by the California Supreme Court:

> It is settled that "[u]nder general negligence principles . . . a person ordinarily is obligated to exercise due care in his or her own actions so as . . . not to create an unreasonable risk of injury to others . . . . It is well established . . . that one's general duty to exercise due care includes the duty not to place another person in a situation in which the other person is exposed to an unreasonable

---

[4] Plaintiffs do not specify in the complaint who they are referring to when using the term "defendants" for purposes of this allegation.  However, based on the use of the term in their pleadings, and based on statements in their opposition to the pending motion, the court construes the term to refer to the individual defendants and not to the City of Fresno.  (*See* Opp. at 11) ("No direct liability of the City of Fresno is alleged.").

[5] In challenging plaintiffs' negligence claim, defendants erroneously proceed directly to the merits of their claimed entitlement to immunity.  The California Supreme has instructed that courts must first analyze whether a defendant owed a plaintiff a duty of care before turning to the issue of immunity:

> In sorting out the issues presented, it is important to consider first things first.  Conceptually, the question of the applicability of a statutory immunity does not even arise until it is determined that a defendant otherwise owes a duty of care to the plaintiff and thus would be liable in the absence of such immunity.

*Davidson v. City of Westminster*, 32 Cal. 3d 197, 201-02 (1982) (citing and quoting *Whitcombe v. County of Yolo* 73 Cal. App. 3d 698, 704 (1977)).

17

1
2

risk of harm through the reasonably foreseeable conduct . . . of a third person.

3   *Zelig v. Cty. of Los Angeles*, 27 Cal. 4th 1112, 1128 (2002) (quoting *Lugtu v. California Highway*

4   *Patrol*, 26 Cal. 4th 703, 716 (2001)).  Public employees—including police officers—generally

5   owe no greater duty to members of the public than that owed by private persons.  Cal. Gov't Code

6   § 820.  Absent a statutorily imposed duty providing otherwise, a police officer owes no duty to a

7   member of the public unless that "officer voluntarily assumes a duty to provide a particular level

8   of protection, and then fails to do so, or . . . undertakes affirmative acts that increase the risk of

9   harm to [that member of the public]."  *Zelig*, 27 Cal. 4th at 1129 (citations omitted).  Thus,

10  plaintiffs cannot recover "for injuries caused by the failure of police personnel to respond to

11  requests for assistance, the failure to investigate properly, or the failure to investigate at all, where

12  the police had not induced reliance on a promise, express or implied, that they would provide

13  protection."  *Williams v. State of California*, 34 Cal. 3d 18, 25 (1983).  When the injury is caused

14  by the acts of a third party, for liability to attach to a police officer, the plaintiff must establish the

15  existence of a special relationship "which imposes a duty upon the [police officer] to control the

16  third person's conduct, or . . . which gives [the plaintiff] a right to protection."  *Davidson*, 32 Cal.

17  3d at 203. *See also Wallace v. City of Los Angeles*, 12 Cal. App. 4th 1385, 1398 (special

18  relationship liability was established when a police detective failed to warn a witness that the

19  person against whom she would be testifying posed an undiscoverable danger to her).

20                              *1.  Failure to Arrest*

21         In California, there is no legal duty for a police officer "to perform a reasonable and

22  adequate investigation" leading to a person's arrest.  *Hucko v. City of San Diego*, 179 Cal. App.

23  3d 520, 522 (1986).  For example, California courts have held that police officers cannot be liable

24  for negligence when they fail to arrest obviously intoxicated drivers, and those drivers go on to

25  injure or kill themselves or others in a vehicular accident.  *See id*. at 521–22 (police officer not

26  liable for failing to arrest intoxicated motorcyclist who later injured himself in motorcycle

27  accident); *Harris v. Smith*, 157 Cal. App. 3d 100, 106 (1984) (noting that "more is required to

28  establish a duty than mere contact between the police and the wrongdoer").

18

1 Regarding Officers Smith and Little's alleged failure to arrest Paul, this court reads

2 plaintiffs' claim of negligence as focusing on the officers' disregard of indications that Paul was

3 the dominant aggressor in the March 13, 2014 fight, signs which plaintiffs argue warranted his

4 immediate arrest.  (FAC at ¶¶ 25–28.)  This complaint amounts to nothing more than an

5 allegation that the officers negligently investigated Paul's act of domestic violence against

6 Pamela.  However, under California law, the commencement of an investigation does not give

7 rise to a duty of care, and, thus, a negligence claim against the individual officers will not lie.  *See*

8 *Jackson v. Clements*, 146 Cal. App. 3d 983, 989 (1983) (holding police officers who detained and

9 then released drunk driver owed no duty of care to victims later injured and killed by same drunk

10 driver); *Stout v. City of Porterville*, 148 Cal. App. 3d 937, 941 (1983) (holding police officer who

11 detained and then released publicly intoxicated individual was not liable for injuries suffered by

12 that individual because the police officer owed them no duty of care).  Nor do plaintiffs make any

13 showing that Officers Smith and Little entered into a special relationship with Pamela or were

14 mandated by any applicable statutes or regulations to arrest Paul.[6]

15 Plaintiffs also appear to allege that Officers Johnson and Couto were negligent for failing

16 to arrest Paul on March 24, 2014.  For the reasons discussed above, this claim also fails.[7]

17 Defendants' motion to dismiss will be granted as to plaintiffs' claim of negligence predicated on

---

18 [6] "The failure of a person to exercise due care is presumed if . . . [h]e violated a statute,
19 ordinance, or regulation of a public entity[.]" Cal. Evid. Code § 669.  While plaintiffs claim that
the individual defendants were mandated under state law to arrest Michael and Paul, they do not
20 cite to any specific statutes or regulations requiring such.  (FAC at ¶ 78.)  For example, plaintiffs
21 cite to California Penal Code §§ 422 and 646.9.  While both provisions make certain behavior
punishable, neither demands that an officer effectuate the arrest of a violating individual.  Even
22 California Penal Code § 13701, which compels "[e]very law enforcement agency in this state [to]
23 develop, adopt, and implement written policies and standards for officers' responses to domestic
violence calls," states only that "[t]he written policies shall *encourage* the arrest of domestic
24 violence offenders if there is probable cause that an offense has been committed."  Absent from
this statutory language is an imperative to arrest.

25 [7] However, the court notes that if Paul had been previously served with a temporary domestic
26 violence restraining order prior to Officer Johnson and Couto's encounter with him, his arrest
would have been mandated—absent exigent circumstances—and failure to arrest under such a
27 situation could have given rise to a cognizable negligence claim.  *See* Cal. Penal Code § 13701(b)
("These policies also shall require the arrest of an offender . . . if there is probable cause that a
28 protective order . . . has been violated.").

the officers' failure to arrest, with leave to amend being granted.

## 2.   Failure to Protect

"[P]olice officers and other public security officers . . . generally may not be held liable in damages for failing to take affirmative steps to come to the aid of, or prevent an injury to, another person." *Zelig*, 27 Cal. 4th at 1128.  The exception to this general rule is if an "officer engaged in an affirmative act that increased the risk of harm" to the plaintiff.  *Id*. at 1130.  For example, in *Zelig*, the California Supreme Court held that individual police officers could not be held liable for failing to prevent the shooting death of a woman inside a public courthouse.  *Id*. at 1129–30.  The decedent was murdered by her ex-husband prior to a hearing on a family law matter.  *Id*. at 1119.  The plaintiff, decedent's daughter, claimed the police officers—responsible for providing security at the courthouse—were negligent in failing to protect her mother even though her mother had previously warned a bailiff about the threat posed by her ex-husband.  *Id*. at 1119, 1122.  Beginning its analysis with the premise that general negligence rules "bar recovery when plaintiffs, having suffered injury from third parties who were engaged in criminal activities, claim that their injuries could have been prevented by timely assistance from a law enforcement officer," the court next looked to see if the defendants had formed a special relationship with the decedent and ultimately decided they had not.  *Id*. at 1130.  In upholding the dismissal of the plaintiff's complaint, the court noted "there [was] no indication that [the decedent's] peril was created by [the police officers'] actions."  *Id*.

The decision in *Antique Arts Corporation v. City of Torrance*, 39 Cal. App. 3d 588 (1974), is also illustrative of the notion that police officers cannot generally be held liable for failing to protect.  In that case, the plaintiff—the owner of jewelry store—claimed a police dispatcher negligently delayed dispatching units in response to a silent burglary alarm triggered at the plaintiff's store.  *Id*.  The court held the police dispatcher could not be found negligent, noting that the plaintiff had failed to establish the existence of a special relationship.  *See id*. at 593 ("The critical element in those cases that have attached liability to a public employee's discretionary acts has been the presence of a special relationship between employee and plaintiff that justified reliance by plaintiff on the employee's statement or promise.").

However, when a "police officer's conduct contribute[s] to, increase[s], or change[s] the risk which would have otherwise existed," a duty to protect will be imposed on that officer. *Davidson*, 32 Cal. 3d at 208.  For example, in *Mann v. State of California*, 70 Cal. App. 3d 773 (1977), the state appellate court reversed the trial court's directed verdict which had been entered on the ground that a highway patrol officer could not be held liable for injuries sustained by stranded motorists after they were hit by an errantly driven car. *Id*. at 777, 780 (1977).  There, the highway patrol officer had started to assist the motorists after discovering them stranded in the speed-change lane of the freeway; however, upon the arrival of a tow truck, but before the motorists were removed from the hazardous situation, the highway patrol officer left the scene. *Id*. at 776–77.  First noting that the officer's conduct disregarded California Highway Patrol safety procedures, the court then went on to explain:

> [w]hile no special relationship may exist between members of the California Highway Patrol and the motoring public generally, or between the Patrol and stranded motorists generally, once a state traffic officer has chosen to investigate the plight of specific persons on a freeway and informed himself of the foreseeable danger to them from passing traffic, a special relationship requiring him to protect them by readily available means arises and liability may attach if the officer's limited duty to protect these people under these special circumstances is not performed.

*Id*. at 780.  In this context, the California Court of Appeal found the trial court had erred in rendering a directed verdict in favor of the defendant highway patrol officer.  *Id*. at 781.

Likewise, in *Wallace v. City of Los Angeles*, 12 Cal. App. 4th 1385 (1993), the California Court of Appeal reversed a grant of nonsuit by a trial court in favor of the defendants.  In that case, a young woman's mother brought a wrongful death action against the city and a detective after an accused murderer killed the young woman upon discovering she would be testifying at his trial.  *Id*. 1388–92.  The trial court granted the motion for nonsuit on the grounds that the police detective owed no duty of care to the decedent.  However, the state appellate court reversed, finding that a special relationship existed between a police detective and the decedent.  *Id*. at 1388.  The court noted that the detective had convinced the decedent to testify at the trial;

1   therefore, because he had created the perilous situation ultimately leading to the decedent's death,

2   he had a duty to warn her of the danger posed by the accused. *Id*. at 1402. In reaching this

3   conclusion, the court explained that while the danger was foreseeable to the detective, it was not

4   "readily discoverable by [the decedent]." *Id*. at 1397.

5         These holdings can be compared with that in *Hatzler v. City of San Jose*, 46 Cal. App. 3d

6   6 (1975), in which the court upheld a demurrer dismissing a wrongful death action against a city.

7   The decedent's estate had sued the city after the decedent—a domestic violence victim—was

8   killed by her estranged husband. *Id*. at 8. The decedent's estate alleged the police were negligent

9   because they did not respond when decedent called the police department for emergency aid. *Id*.

10   The decedent's estate also alleged that she had entered into a special relationship with the police

11   as a result of the police having "responded 20 times to her calls and ha[ving] arrested her husband

12   once . . . ." *Id*. at 8, 10. The state appellate court rejected both arguments. Regarding the claim

13   that a special relationship existed, the court held "[a]bsent an indication that the police had

14   induced decedent's reliance on a promise, express or implied, that they would provide her with

15   protection, it must be concluded that no special relationship existed and that appellant has not

16   stated a cause of action." *Id*. at 10.

17         Upon reviewing the applicable California case law, this court concludes that plaintiffs'

18   claim for failure to protect is deficient. Plaintiffs have not alleged that the defendant officers

19   engaged in affirmative acts or made promises that caused either Pamela or Cindy, as a result of

20   their justifiable reliance on said acts or promises, to be placed in a perilous situation. Unlike in

21   *Mann* and *Wallace*, the defendant officers' failure to seek an arrest warrant or to issue a notice at

22   large did not *increase* the risk of harm to either Pamela or Cindy. While the defendant officers'

23   inaction certainly did not serve to augment plaintiffs' safety, California law provides that a

24   negligence claim premised on a police officer's failure to protect must involve more than a refusal

25   or delay in the officer offering him or herself as a shield against danger. Moreover, unlike in

26   *Wallace*, Pamela and Cindy were both aware that Paul and Michael were abusive, and thus, the

27   danger posed by both men was already known by them. Finally, plaintiffs cannot rely on the

28   alleged statement by the unnamed officer to Cindy that "he would arrest [Michael] for violating

1    his parole" as the basis for a special relationship because plaintiffs have not alleged how these

2    words contributed to, increased, or otherwise altered the level of risk to which Cindy was already

3    exposed.  (FAC at ¶ 45.)  For these reasons, defendants motion to dismiss will be granted as to

4    plaintiffs' claim of negligence predicated on a failure to protect and leave to amend will be

5    granted.

6                                    *3.    Failure to Provide Information*

7            Plaintiffs allege that the defendant officers did not perform their duties with due care by

8    failing to provide either Pamela or Cindy with informational materials about domestic violence or

9    to inform either of their citizen's arrest rights.  Plaintiffs allege they were entitled to receipt of

10   this information pursuant to California Penal Code § 836(b).  Defendants counter by arguing

11   California Penal Code § 836(b) does not give rise to a private right of action.  However, plaintiffs

12   do not allege a cause of action under California Penal Code § 836(b).  Rather, plaintiffs allege

13   that the statute imposes a statutory duty of care making the doctrine of negligence per se

14   applicable.  In this regard,

15               [California] Evidence Code § 669 creates a presumption of
16               negligence from the violation of a statute or ordinance.  There are
                 four 'basic facts' which must be shown for this presumption to
17               apply: (1) the violation; (2) the violation as a proximate cause of the
                 injury; (3) an injury resulting from an occurrence of the nature
18               which the statute was designed to prevent; and (4) the injured party
                 being a member of the class of persons for whose protection the
19               statute was adopted.

20   *Salinero v. Pon*, 124 Cal. App. 3d 120, 134 (1981).

21           Here, there are no factual allegations that the defendant officers' failure to provide

22   plaintiffs with mandated domestic violence victim information, including instructions on how to

23   perform a citizen's arrest, was the proximate cause of plaintiffs' injuries.  Plaintiffs merely repeat

24   the allegation that the defendant officers failed to adhere to California Penal Code § 836(b); they

25   provide no allegation this omission caused their injuries.  Accordingly, defendants' motion to

26   dismiss plaintiffs' negligence claim arising from the defendant officers' failure to provide

27   mandated information will be granted and the claim dismissed with leave to amend.

28   /////

                                                    23

*4.  Failure to Enforce the VAWA*

Plaintiffs allege that "Fresno was also negligent in effectuating and ensuring the full enforcement of the [VAWA] and in permitting women such as Pamela and Cindy to be revictimized by its officers."  (FAC at ¶ 78.)  Under California Government Code § 815, public entities in California enjoy immunity from liability for injuries unless provided otherwise by a separate statute.  While California Government Code § 815.6 does create public entity liability for failure to enforce a mandatory duty in some circumstances, there is no indication that the VAWA creates a mandatory duty.  Accordingly, defendants' motion to dismiss as to this cause of action will be granted, with this claim being dismissed with prejudice.

*5.  Revictimizing Statements*

Plaintiffs also allege Cindy was harmed by the unnamed officer's "revictimizing" statements.  Plaintiffs' contend that as a result of the unnamed officer's statements, Cindy avoided calling the FPD because "she believed that they would not respond to her address."  (FAC at ¶ 47.)  Again, according to plaintiffs, the unnamed officer told Cindy that "if she continued to associate with [Michael] she would be 'crying wolf' and would not receive any responses to her calls or service to her address."  (FAC at ¶ 44.)

Based on the FAC, it appears plaintiffs are attempting to allege the unnamed officer's "conduct contributed to, increased, or changed the risk which would have otherwise existed," thus imposing a duty to protect on the unnamed officer.  *See Davidson*, 32 Cal.3d at 208.  For reasons discussed above, this court finds the allegations insufficient to state a cognizable claim.  *See* Section III.a.2, above.  Plaintiffs have failed to allege that the unnamed officer owed a duty to protect Cindy.  Accordingly, defendants' motion to dismiss as to this cause of action will be granted and plaintiffs' claim for negligence predicated on the alleged revictimizing statements made to Cindy will be dismissed with leave to amend.

ii.  *State Law Claims Against Fresno*

Defendants argue that any of plaintiffs' claims against the FPD stemming from the alleged acts of the defendant officers based upon a vicarious liability theory must be dismissed.  (Opp. at 11.)  Public entities are generally immune from liability for injuries unless there exists a statute

1   holding otherwise.  Cal. Gov't Code § 815.  California Government Code § 815.2 creates liability

2   for public entities for "injur[ies] proximately caused by an act or omission of an employee of the

3   public entity within the scope of his employment . . . ."  Nonetheless, plaintiffs have failed to

4   allege facts that would establish the alleged acts or omissions of any of the defendant officers

5   proximately resulted in their injuries.  Thus, defendants' motion to dismiss as to this cause of

6   action will be granted and plaintiffs' claim against Fresno premised on a theory of vicarious

7   liability will also be dismissed with leave to amend.

8           **c.   Injunctive/Declaratory Relief**

9           Defendants argue plaintiffs cannot seek injunctive and declaratory relief because they

10   cannot succeed on their underlying federal and state law claims.  (MTD at 18–19.)  This argument

11   is unpersuasive, because as discussed above, Cindy has alleged facts giving rise to a cognizable

12   equal protection claim.  Nonetheless, plaintiffs' claim for injunctive relief must be dismissed on

13   standing grounds.  *See B.C. v. Plumas Unified Sch. Dist.*, 192 F.3d 1260, 1264 (9th Cir. 1999)

14   ("[F]ederal courts are required to *sua sponte* examine jurisdictional issues such as standing.").

15          "It goes without saying that those who seek to invoke the jurisdiction of the federal courts

16   must satisfy the threshold requirement imposed by Article III of the Constitution by alleging an

17   actual case or controversy."  *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983).  Thus, when

18   seeking injunctive relief, "[t]he plaintiff must show that he . . . is immediately in danger of

19   sustaining some direct injury as the result of the challenged official conduct and . . . [the] threat of

20   injury must be both real and immediate, not conjectural or hypothetical."  *Id.* at 101–02.

21          Here, Cindy—and not Pamela—has alleged a cognizable claim that she suffered an equal

22   protection violation because of the past conduct of officers of the FPD.  As a result, she is entitled

23   to seek damages with respect to that claim.  However, "[p]ast exposure to illegal conduct does not

24   in itself show a present case or controversy regarding injunctive relief . . . ."  *Id.* at 102 (citing

25   *O'Shea v. Littleton*, 414 U.S. 488, 495–96).  Injunctive relief seeks to prevent future injuries, and

26   a past harm, unaccompanied by allegations or evidence showing that a plaintiff is likely to suffer

27   future injuries, is incapable of transferring a perceived threat from the realm of speculation to the

28   realm of certitude, leaving the court without a case or controversy.  Because Cindy is deceased, it

25

1  is impossible for her to suffer future harms. *See California Advocates for Nursing Home Reform,*

2  *Inc. v. Chapman*, Case No. 12-cv-06408-JST, 2013 WL 5946940, at *8, n. 3 (N. D. Cal. Nov. 5,

3  2013).  Thus, she lacks standing to pursue injunctive relief, and her claim for injunctive relief will

4  therefore be dismissed with prejudice.  Because Pamela may be able to present a cognizable §

5  1983 claim in any second amended complaint plaintiffs' elect to file, her claim for injunctive

6  relief will be dismissed with leave to amend.

7  **IV.    Conclusion**

8         For all of the set forth above, defendants' motion to dismiss is granted in part and denied

9  in part as follows:

10                1.   The court dismisses with leave to amend the following claims brought by

11                     plaintiff Pamela Motley:

12                          a.   First Claim for Relief – Substantive Due Process

13                          b.   First Claim for Relief – Equal Protection

14                          c.   First Claim for Relief – Municipal Liability

15                          d.   Fourth Claim for Relief – Negligence

16                          e.   Sixth Claim for Relief – Injunctive Relief

17                2.   The court dismisses with leave to amend the following claims brought by

18                     plaintiff Cindy Raygoza:

19                          a.   First Claim for Relief – Substantive Due Process

20                          b.   Fourth Claim for Relief - Negligence

21                3.   The court dismisses plaintiff Cindy Raygoza's Sixth Claim for Relief –

22                     Injunctive Relief with prejudice;

23                4.   To the extent plaintiffs' Fourth Claim for Relief – Negligence is based on

24                     defendants' alleged failure to enforce the VAWA, the courts dismisses that

25                     claim with prejudice; and

26  /////

27  /////

28  /////

26

Case 1:15-cv-00905-DAD-BAM   Document 57   Filed 06/20/16   Page 27 of 27

5. Any amended complaint[8] shall be filed and served within twenty days of the service of this order.

IT IS SO ORDERED.

Dated: __**June 20, 2016**__          _____

                                 UNITED STATES DISTRICT JUDGE

---

[8] Plaintiffs are informed that the court cannot refer to prior pleadings in order to make an amended complaint complete. Local Rule 220 requires that an amended complaint be complete in itself. This is because, as a general rule, an amended complaint supersedes the original complaint. *See Loux v. Rhay*, 375 F.2d 55, 57 (9th Cir.1967). Accordingly, once plaintiffs file an amended complaint, the original no longer serves any function in the case. Finally, the court cautions plaintiffs that failure to comply with the Federal Rules of Civil Procedure, this court's Local Rules, or any court order may result in dismissal. *See* Local Rule 110.

27