UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAMELA MOTLEY; ESTATE OF CINDY RAYGOZA, through its legal representative and administrator, YVETTE CALDERA; YVETTE CALDERA; VALERIE CALDERA; DANNY RICE,<br><br>Plaintiffs,<br><br>v.<br><br>JOSEPH SMITH; BRIAN LITTLE; DERRICK JOHNSON; MICHAEL COUTO; BERNARD FINLEY; BYRON URTON; RYAN ENGUM; UNKNOWN FRESNO POLICE OFFICERS; THE CITY OF FRESNO, CALIFORNIA,<br><br>Defendants. | No. 1:15-cv-00905-DAD-BAM<br><br>ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, DENYING DEFENDANTS' MOTION IN LIMINE AS MOOT, AND DENYING PLAINTIFFS' MOTION FOR SANCTIONS<br><br>(Doc. Nos. 102, 106, 107) |

This matter is before the court on defendants' motion for summary judgment (Doc. No. 102), defendants' motion *in limine* to exclude certain evidence (Doc. No. 106), and plaintiffs' motion for sanctions (Doc. No. 107). On November 7, 2017, those motions came before the court for hearing. Attorneys Kevin G. Little and Robert G. Fuentes appeared on behalf of the plaintiffs. Attorney Anthony M. Sain appeared on behalf of the defendants. Having reviewed the parties' briefing and heard arguments, and for the reasons that follow, defendants' motion for summary

/////

/////

1

judgment will be granted, defendants' motion *in limine* will be denied as moot, and plaintiffs' motion for sanctions will be denied.[1]

**BACKGROUND**

The facts in this tragic case involving two acts of domestic violence, one deadly and the other severely disabling, are as follows and are undisputed except where noted. On March 13, 2014, plaintiff Pamela Motley called the Fresno Police Department ("FPD") and reported that her husband Paul Motley ("Paul") had attacked her the prior day. (Doc. No. 120 ("UMF") at ¶ 1.) FPD Officers Smith and Little responded to Pamela Motley's location the following day. (*Id.* at ¶ 2.) Paul was not present when Officers Smith and Little arrived. (*Id.*) The officers observed Pamela Motley's injuries, and later the same day, they located Paul and also observed injuries on his body. (*Id.*) The FPD officers did not arrest Paul at that time because they concluded that his injuries were indicative of "mutual combat," although the parties dispute whether such a conclusion was justified as a matter of law. (*Id.*) The officers also requested an emergency restraining/protective order ("EPO") against Paul, provided the emergency protective order to Pamela Motley, and served it on Paul that same day. (*Id.* at ¶ 3.) That EPO was set to expire by March 21, 2014. (*Id.* at ¶ 4) The parties dispute whether Paul was subject to a separate court-issued protective order stemming from a January 6, 2014 incident in which he allegedly attacked another woman. (*Id.* at ¶ 5.) The parties further dispute whether Officers Smith and Little provided Pamela Motley with an FPD domestic violence information form, as they were required to do under FPD policy. (*Id.* at ¶ 6.) Specifically, FPD officers are trained to provide a domestic violence information form to each domestic violence victim they encounter on their calls and to advise domestic violence victims of their right to make a citizen's arrest. (*Id.* at ¶ 7.) Plaintiffs contend that as a factual matter, FPD officers frequently fail to do so, and none of the parties or non-party declarants offered by plaintiffs ever received this information from FPD officers. (*Id.*)

Officers Smith and Little discovered a firearm registered to Paul that was in the control of the Pamela Motleys' adult daughter. (*Id.* at ¶ 11.) The daughter retrieved the firearm and turned

---

[1] Below, the court will also addresses plaintiffs' "Suggestion for *Sua Sponte* Reconsideration." (Doc. No. 123.)

2

it over to the officers. (*Id.*) Plaintiff Pamela Motley contends that this discovery warranted Paul's arrest, because the conditions of the protective order prohibited him from owning or controlling a firearm. (*Id.*).

On March 18, 2014, when the EPO was set to expire, Pamela Motley obtained a separate domestic violence restraining order ("DVRO") against Paul barring him from (among other things) coming to her home or work, contacting her, and harassing her. (*Id.* at ¶ 12.) From that point until April 12, 2014, the parties agree that Paul threatened and harassed Pamela Motley, including by phone and text, but did not physically harm her. (*Id.* at ¶ 13.) On March 24, 2014, Paul went to Pamela Motley's place of work and demanded that she give him the keys to her car. (*Id.* at ¶ 14.) Plaintiff Pamela Motley contends that in addition to demanding her car keys, Paul threatened her and said he was going to break all of the car windows if she did not comply with his request. (*Id.*) FPD Officers Couto and Johnson responded to her location on the same day. (*Id.*) The officers confirmed that the DVRO had been issued, but that Paul was not in violation because he had not been served with the order. (*Id.* at *¶* 15.) Paul was then served with the DVRO, but he was not arrested—plaintiff contends that he should have been arrested at that time because he was in violation of the January 6, 2014 protective order. (*Id.* at ¶ 16) Officer Johnson informed Paul that he could not come within 100 yards of Pamela Motley or her place of employment, and could not contact her. (*Id.* at ¶ 17.) The parties dispute whether, before leaving the scene, the FPD officers provided Pamela Motley with the domestic violence information form as required by policy. (*Id.* at ¶¶ 18–19.)

On March 25, 2014, Pamela Motley awoke to find that Paul had called and texted her, and she also believed that he had slashed the tires of her car, which was parked at her home. (*Id.* at ¶ 20.) She called the FPD twice that day to report the incident. (*Id.*) On March 26, 2014, Officer Finley responded to her location and confirmed that Paul had called/texted Pamela Motley in violation of the DVRO. (*Id.* at ¶ 21.) Officer Finley attempted to contact Paul at his residence but was unsuccessful. (*Id.* at ¶ 22.) Plaintiff Pamela Motley's expert has opined that Officer Finley did not adhere to best practices pertaining to domestic violence, which required him to issue a warrant, issue a "be on the lookout" notice, make repeated attempts to contact the alleged

3

perpetrator, or advise the victim of her rights under Penal Code § 13701(c)(9). (*Id.*) Defendants maintain that if Officer Finley had located Paul, he would have arrested him at that time. (*Id.* at ¶ 23.) Plaintiff Pamela Motley disputes this because other FPD officers previously had cause to arrest Paul but failed to do so. (*Id.*) The parties also again dispute whether Officer Finley provided Pamela Motley with a domestic violence information form, although Pamela Motley testified at her deposition that she does not know how she would have been better protected if she had received the information contained in the domestic violence form. (*Id.* at ¶¶ 24, 25.)

On March 28, 2014, Pamela Motley called the FPD and reported that Paul had continued to call and text her in violation of the DVRO. (*Id.* at ¶ 26.) She also reported that through third parties, she heard that Paul had threatened to kill her and her parents. (*Id.*) Paul did not personally threaten to kill Pamela Motley in his calls and texts to her on this occasion, although Pamela Motley contends that he had done so in the past. (*Id.* at ¶ 27.) FPD officers began to respond to Pamela Motley's home, but upon doing so learned that she had relocated to Kerman, CA. (*Id.* at ¶ 28.) FPD's response was then canceled, although Pamela Motley contends that this response by FPD to Paul's threats was inadequate. (*Id.*) Paul was not arrested that day, or on April 3, 2014 when he appeared in court on related restraining order proceedings initiated by Pamela Motley's parents. (*Id.* at ¶ 29.) Pamela Motley also contends that Paul had a court appearance in a criminal case on April 1, 2014 and was also not arrested at that time. (*Id.*) It is undisputed that no FPD officers were present at these court proceedings, or even aware of them, although Pamela Motley contends that if FPD officers had complied with the prevailing practices, documentation would have been generated that would have resulted in Paul's arrest at the time of his appearance in court. (*Id.* at ¶ 30.)

On April 7, 2014, Paul threatened Pamela Motley in person that he would kill her with his gun if she did not return to him by April 14, 2017. (*Id.* at ¶ 31.) FPD Officer Urton responded to Pamela Motley's location that same day. (*Id.* at ¶ 32.) The parties dispute the nature of the interaction between Officer Urton and Pamela Motley. (*See id.* at ¶¶ 33–38.) Defendants contend that Officer Urton stayed approximately 80 minutes with Pamela Motley and that in addition to questioning her about Paul's threat, he also provided her with information about how to protect

4

herself. (*Id.*) By contrast, Pamela Motley contends that Officer Urton was rude, insensitive, made sexist remarks to Pamela Motley, and stayed only about ten to fifteen minutes. (*Id.*) The parties further dispute whether, after this interaction, Officer Urton drove to Paul's house in an attempt to arrest him. (*Id.* ¶ 39.) Defendants claim that Officer Urton knocked repeatedly on Paul's door and waited outside his house for approximately 40 minutes, while Pamela Motley has presented evidence that Officer Urton never went to Paul's house. (*Id.*) In any event, Paul was not arrested on April 7, 2014. (*Id.*)

On April 9, 2014, Paul made another appearance in court in a proceeding involving Pamela Motley. (*Id.* at ¶ 40.) No FPD officers or defendants were present at that time, although plaintiffs contend that, had the officers complied with domestic violence law, policy, and prevailing practices, Paul would have been arrested at that time. (*Id.*) Paul was not arrested.

On April 12, 2014, Paul, while lying in wait, shot Pamela Motley outside of her parents' home, which resulted in her paralysis. (*Id.* at ¶ 41.)

On or about February 24, 2014, Cindy Raygoza called the FPD to report that her ex-boyfriend, Michael Reams ("Reams"), had entered her home without her consent, attacked her, and tried to choke her. (*Id.* at ¶ 45.) FPD Officer Engum responded to Cindy Raygoza's location, but Reams had already fled by the time the officer arrived. (*Id.* at ¶ 46.) Officer Engum, who was accompanied by Officer Fern, took Cindy Raygoza's statement, ran a criminal history check, and informed Cindy Raygoza that Reams had been convicted of domestic violence in the past. (*Id.* at ¶¶ 47–49.) Plaintiffs contend that when Cindy Raygoza told police that she had been a victim of domestic violence in a prior marriage, Officer Engum "criticize[d] her choices of men," a statement which Officer Engum denies making. (*Id.* at ¶ 50.) Officer Engum advised Cindy Raygoza that because she was aware of Reams's violent nature, she should avoid associating with him. (*Id.* at ¶ 51.) Officer Engum then offered Cindy Raygoza an EPO, but she declined, stating that she wanted a permanent or full-time restraining order. (*Id.* at ¶ 52.) Plaintiffs contend that one of the officers told Cindy Raygoza that if she chose to continue to associate with Reams, her future calls related to him would be viewed as her "crying wolf" and that she "would not receive any responses" from the FPD. (*Id.* at ¶ 53.) Officer Engum then advised Cindy Raygoza that he

5

intended to arrest Reams for violation of his parole.  (*Id.* at ¶ 54.)  The parties dispute whether the officers provided Cindy Raygoza with an FPD domestic violence form, and whether Cindy Raygoza displayed any evidence of her physical injuries to the officers.  (*Id.* at ¶¶ 55–56.)  After canvassing the area for approximately 20 minutes, Officer Engum was unable to locate Reams and departed.  (*Id.* at ¶ 59.)  Following this event, Cindy Raygoza did not report any other incidents to FPD regarding Reams.  (*Id.* at ¶¶ 55–58.)

On July 14, 2014, Reams broke into Cindy Raygoza's residence, pinned her to the ground, and stabbed her repeatedly.  (*Id.* at ¶ 61.)  FPD Officers Engum and Ruelas responded immediately after neighbors called FPD to report the incident.  (*Id.* at ¶ 62.)  Upon forcing their way into Cindy Raygoza's residence, the officers saw Reams on top of Raygoza, stabbing her.  (*Id.* at ¶ 63.)  Officer Ruelas then shot and killed Reams.  Cindy Raygoza died from her injuries.  (*Id.*)

The FPD is a fully certified law enforcement agency in compliance with the minimum standards set forth by the California Peace Officer Standards and Training (P.O.S.T.) Commission, which are statewide standards governing the hiring, training, and supervision of police personnel.  (*Id.* at ¶ 69.)  The FPD operates with widely recognized and published policies and commonly accepted police procedures.  (*Id.*)  Plaintiffs contend that despite this, with respect to domestic violence cases, the FPD does not in fact comply with best practices or adhere to the minimum standards established by the California P.O.S.T. Commissions.  (*Id.*)  Although it is undisputed that the FPD or the City of Fresno does not have an official policy discriminating on the basis of gender or against domestic violence victims, the parties very much dispute whether a *de facto* policy or custom to that effect exists.  (*Id.* at ¶ 68.)  Plaintiffs further maintain that the evidence on summary judgment supports the conclusion that defendants were not properly trained on the circumstances under which they must carry out an arrest.  (*Id.* at ¶¶ 70, 71.)

## LEGAL STANDARD

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

In summary judgment practice, the moving party "initially bears the burden of proving the absence of a genuine issue of material fact." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The moving party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B). When the non-moving party bears the burden of proof at trial, as plaintiff does here, "the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *Oracle Corp.*, 627 F.3d at 387 (citing *Celotex*, 477 U.S. at 325); *see also* Fed. R. Civ. P. 56(c)(1)(B). Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment . . . is satisfied." *Id.* at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits or admissible discovery material in support of its contention that the dispute exists. *See* Fed. R. Civ. P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11; *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) ("A trial court can only consider admissible evidence in ruling on a motion for summary judgment."). The opposing party must demonstrate that the fact in contention is

material, i.e., a fact that might affect the outcome of the suit under the governing law, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the non-moving party, *see Anderson*, 477 U.S. at 250; *Wool v. Tandem Computs. Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv.*, 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587 (citations omitted).

"In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all inferences supported by the evidence in favor of the non-moving party." *Walls v. Cent. Contra Costa Cty. Transit Auth.*, 653 F.3d 963, 966 (9th Cir. 2011). It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

**DISCUSSION**

**A.    Summary Judgment**

Defendants move for summary judgment in their favor with respect to all of plaintiffs' claims, or in the alternative for partial summary judgment. (Doc. No. 102.) The court addresses each of defendants' arguments in turn below.

      1.    Plaintiffs' Equal Protection Claims

Defendants first argue that they are entitled to summary judgment in their favor with respect to plaintiffs' claims that they were denied equal protection based on both their gender and

status as victims of domestic violence.

Before addressing plaintiffs' equal protection claims in light of the evidence presented on summary judgment, certain preliminary issues must be addressed. As an initial matter, it has been recognized that "there is no constitutional right to be protected by the state against being murdered by criminals or madmen." *Estate of Macias v. Ihde*, 219 F.3d 1018, 1028 (9th Cir. 2000) (quoting *Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir. 1982)). By the same token, individuals do have a constitutional right "to have police services administered in a nondiscriminatory manner—a right that is violated when a state actor denies such protection to disfavored persons." *Id.* (citations omitted). In bringing this action plaintiffs contend, in essence, that their assailants were "given a pass by the police" because of the officers' bias against their victims. *See Elliot-Park v. Manglona*, 592 F.3d 1003, 1006 (9th Cir. 2010). To establish an Equal Protection Clause violation in the context of discriminatory policing, a plaintiff must prove that: (1) defendants' enforcement of the law had the effect of discriminating against members of the disfavored group/class; and (2) the police were motivated by a discriminatory purpose. *Rosenbaum v. City & County of San Francisco*, 484 F.3d 1142, 1152 (9th Cir. 2007) (citing *Wayte v. United States*, 470 U.S. 598, 608 (1985)).

Here, defendants' argue that there is no evidence before the court on summary judgment of disparate treatment of plaintiffs vis-à-vis similarly situated individuals who are not members of the protected class. In an analogous case in which an Equal Protection Clause violation was alleged based upon discriminatory prosecution, the Ninth Circuit observed that in order to prove a discriminatory effect, "the claimant must show that similarly situated individuals . . . were not prosecuted." *Lacey v. Maricopa County*, 593 F.3d 896, 920 (9th Cir. 2012) (quoting *United States v. Armstrong*, 517 U.S. 456, 465 (1996)). In other words, it is not enough to show that plaintiffs were treated poorly; there must also be a showing that they were treated in a *worse* fashion than similarly situated individuals. Plaintiffs may satisfy this requirement in multiple ways. First, a plaintiff may present a statistical analysis showing a disparity in the government's treatment of disfavored and non-disfavored groups. *See Armstrong*, 517 U.S. at 470 (considering whether a study showing racial disparities in prosecution was sufficient to show discriminatory

9

effect); *Yick Wo v. Hopkins*, 118 U.S. 356, 374 (1886) (finding that a facially neutral city ordinance regulating laundromats violated the Equal Protection Clause where the plaintiff demonstrated that permits were denied to 200 Chinese persons but granted for 80 similarly situated non-Chinese persons). Alternatively, a plaintiff may point to specific instances in which the government treated similarly situated individuals differently, which would allow the factfinder to infer that the different treatment resulted from invidious discrimination. *See Gilani v. Matthews*, 843 F.3d 342, 348–49 (8th Cir. 2016) (considering both specific instances of disparate treatment and statistical analysis in determining whether a plaintiff had demonstrated discriminatory effect); *Chavez v. Ill. State Police*, 251 F.3d 612, 636 (7th Cir. 2001) (citing *Armstrong*, 517 U.S. at 467) (same); *see also Elliot-Park*, 592 F.3d at 1006 (noting a discriminatory effect in policing where an officer fully investigated an identical crime that occurred on the same night, but declined to fully investigate the crime committed against plaintiff).

Here, defendants persuasively argue that plaintiffs have failed to present evidence on summary judgment supporting the required showing of discriminatory effect. There is no evidence before the court on summary judgment suggesting that the FPD treats men or non-domestic violence victims any differently than the crime victims who have brought this action. Plaintiffs merely state in their opposition brief that "[t]he officers' recurring failures to follow state law and best practices stand in stark contrast to the [FPD's] handling of other cases." (Doc. No. 118 at 12.) But plaintiffs do not direct the court's attention to evidence with respect to the "other cases" to which they refer, nor does the court find any such evidence before it. The court is therefore left with plaintiff's conclusory assertion that crime victims Pamela Motley and Cindy Raygoza were somehow treated "differently" than other similarly situated victims, with no explanation as to how this is so. Such conclusory assertions, unsupported by any evidence, are insufficient to survive a motion for summary judgment.

It is true that plaintiffs have presented evidence on summary judgment that the FPD is "a gold medal organization, as adjudged by the Commission on Accreditation for Law Enforcement Agencies, Inc. (CALEA)." (UMF ¶ 43.) Plaintiffs argue that this accreditation "shows that its

officers are overall very professional, high performing, and well trained." (*Id.*) Given this accreditation and the FPD's "general diligence," plaintiffs contend that "it is at least a palpable inference that, outside of the domestic violence area, the types of glaring failures recounted above would not occur at all, much less repeatedly." (*Id.*)

Plaintiffs have failed to cite any authority for the proposition that a violation of police department "best practices," without more, is sufficient to support a finding of discriminatory effect under the Equal Protection Clause. Violation of such best practices, even if proven, would do no more than show that the FPD was not living up to its own standards, or to the standards of a certifying agency such as CALEA. It would not be sufficient to establish that the FPD and its officers were providing substandard law enforcement for a particular subset of the general population, such as women or victims of domestic violence.

Plaintiffs do cite to three cases which, they claim, should preclude the granting of summary judgment in favor of defendants with respect to their equal protection claim. The first case relied upon by plaintiffs is one in which the district court dismissed plaintiff's equal protection claim with prejudice, even though the plaintiff had alleged in her complaint that officers refused to place her husband under arrest after beating her, and were "rude, insulting and unsympathetic" towards her. *See Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 698 (9th Cir. 1988). In *Balistreri* the plaintiff had also alleged that a responding officer said he "did not blame plaintiff's husband for hitting her, because of the way she was carrying on." *Id.* at 701 (internal quotations and citation omitted). The Ninth Circuit reversed, concluding that the plaintiff should have been granted leave to amend her complaint since facts alleged in her opposition to the motion to dismiss "if true, may be a proper subject for relief." *Id.*

The decision in *Balistreri* was issued in the context of a motion to dismiss, whereas the instant action is now before the court on a motion for summary judgment. The question before the court in *Balistreri* was whether, from the complaint and opposition to the motion to dismiss, it could "conceive of facts" that would entitle plaintiff to relief, such that granting leave to amend the complaint was appropriate. *Id.* (quoting *Hall v. City of Santa Barbara*, 833 F.2d 1270, 1274 n.6 (9th Cir. 1986)). The court in *Balistreri* properly noted that in her opposition to the motion to

dismiss plaintiff had "alleged facts indicating that as a woman, she was discriminated against when seeking police protection from a known danger, her former husband." *Id.* Plaintiffs in this case have done likewise. However, at the summary judgment stage, it is insufficient merely to allege such discrimination. Rather, at this stage of the litigation evidence of discrimination must be presented by the plaintiffs since they will bear the burden of proof on that issue at trial. The decision in *Balistreri* does not stand for the proposition that evidence of discriminatory *intent* can raise a triable issue of fact as to discriminatory *effect*. To do so would collapse the two-part equal protection inquiry into a single prong. The court does not read *Balistreri* to have effectuated such a change in equal protection law. The decision in *Balistreri*, therefore, provides no support to plaintiffs in opposing defendants' motion for summary judgment.

Second, plaintiffs direct the court's attention to a case in which the Ninth Circuit reversed a grant of summary judgment on the plaintiffs' equal protection claim in which it was alleged that police failed to timely respond to domestic violence calls. *See Navarro v. Block*, 72 F.3d 712 (9th Cir. 1995). The Ninth Circuit in *Navarro* held that even though the plaintiffs had not demonstrated that the sheriff's department in question had intentionally discriminated against women, their equal protection claims survived a motion for summary judgment on the basis of discrimination against victims of domestic violence "because they could prove that the domestic violence/non-domestic violence classification fails even the rationality test." *Id.* at 717. In other words, even though there was no evidence that the county sheriff's department intended to discriminate against women, there was evidence presented on summary judgment showing that the county had a policy of responding less urgently to domestic violence calls. In particular, in *Navarro* a 911 dispatcher had testified at deposition that dispatchers in the county "were not instructed to treat domestic violence calls as emergencies." *Id.* at 715.

The Ninth Circuit in *Navarro* confined its equal protection analysis to the question of discriminatory intent, since there was apparently no dispute as to discriminatory effect. The plaintiffs in *Navarro* came forward on summary judgment with direct evidence that the sheriff's department treated domestic violence victims differently than victims of other crimes and that "it was the *practice* of the Sheriff's Department not to classify domestic violence calls as an

'emergency.'" *Id.* By contrast, plaintiffs here have produced no similar evidence that defendants treated domestic violence victims any worse than victims of any other crime. At most, the plaintiffs in this case have shown that the FPD's response to reports of domestic violence may have fallen below the standards the FPD sets for itself. They have not, however, presented any evidence showing that the FPD's response to domestic violence crimes was any different than its response to any other crimes.

Third, plaintiffs cite to a case with a factual background similar to the present case. *See Estate of Macias*, 219 F.3d at 1018. However, the Ninth Circuit in that case did not confront the question of whether the decedent's Equal Protection right to non-discriminatory policing had been violated, and therefore had no occasion to consider whether the policing in that case had a discriminatory effect on a disfavored class. Rather, the court remanded the case to the district court to allow the parties to conduct discovery as to whether the defendants' conduct had deprived the decedent of her right to equal police protection and for the trial court to ultimately consider that question. *Id.* at 1028. Therefore, the decision in *Estate of Macias* provides no support to plaintiffs in opposing defendants' motion for summary judgment.

As noted at the outset, the events at issue in this case are tragic. However, because plaintiffs have failed to come forward with any evidence of a discriminatory effect, defendants' motion for summary judgment with respect to plaintiffs' Equal Protection claims must be granted.[2]

### 2. Plaintiffs' Claims under California Law as Time-Barred

Defendants move for summary judgment in their favor as to all of plaintiffs' state law tort claims on the grounds that they are time-barred under the California Tort Claims Act ("CTCA"), and are substantively deficient under that same statute. The court addresses these arguments in turn below.

/////

---

[2] Because plaintiffs have failed to come forward with evidence upon which they could prevail on their Equal Protection claims against the individual defendants, the court need not reach the issue of qualified immunity, the City of Fresno's liability under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), or the imposition of punitive damages.

Under the CTCA, "[a] claim relating to a cause of action for death or injury to person . . . shall be presented as provided . . . not later than six months after the accrual of the cause of action." Cal. Gov't Code § 911.2(a). Defendants argue that plaintiffs failed to comply with this timeline, and that failure "bars the action." *Javor v. Taggart*, 98 Cal. App. 4th 795, 804 (2002).

Plaintiff Pamela Motley submitted a claim for damages to the City of Fresno on September 30, 2014, less than six months after she was shot by her ex-husband Paul. (UMF at ¶ 78.) On December 22, 2014, Cindy Raygoza's children did the same on behalf of themselves and the Estate of Cindy Raygoza, which was less than six months after Ms. Raygoza was killed. (*Id.* at ¶ 79.) Defendants offer no explanation in their motion as to how the filing of these claims failed to satisfy § 911.2(a). The court therefore rejects defendants' contention that plaintiffs' state law claims are time-barred.

Alternatively, defendants contend that plaintiffs' claims were deficient under the CTCA. In particular, defendants argue that the claim, when filed, must include certain particulars, such as the causes of action under which a plaintiff intends to proceed. (Doc. No. 102 at 35) (citing Cal. Gov't Code §§ 910, 910.2, 910.4). Defendants argue that plaintiffs failed to include their causes of action in their original claims against the City of Fresno, and that their claims are therefore barred. (*Id.* at 36.)

The court is not persuaded by defendants' argument. California Government Code § 910 requires that a claim contain only "[a] general description of the indebtedness, obligation, injury, damage or loss incurred so far as it may be known." Cal. Gov't Code § 910(d). The law does not require a claimant to specify the precise legal theories she intends to pursue, and the phrase "cause of action" does not appear in the statute. Nonetheless, the court concludes that it need not decide this question because it finds that defendants have waived this argument. Government Code § 910.8 provides that if a claim fails to substantially comply with the requirements of § 910, the government may give written notice of the insufficiency and must state therein with particularity the claim's defects or omissions. Cal. Gov't Code § 910.8. Further, a separate provision of the CTCA provides that the failure to give timely notice of the insufficiency of a claim constitutes waiver of "[a]ny defense as to the sufficiency of the claim based upon a defect

14

or omission in the claim as presented." Cal. Gov't Code § 911. The evidence presented by defendants on summary judgment with respect to this issue reflects that the City of Fresno rejected the plaintiffs' claims outright and did not alert them with the required specificity to any alleged deficiencies in those claims. Defendants have therefore waived this argument and are not entitled to summary judgment with respect to plaintiffs' state law claims on this ground.

3. Plaintiffs' Negligence Claim

Defendants argue on multiple grounds that they are entitled to summary judgment in their favor on plaintiffs' negligence claims. The court first addresses defendants' argument that in light of the undisputed facts any breach of a duty owed was not the proximate cause of any injury to plaintiffs.

California Penal Code § 836(b) requires that "[a]ny time a peace officer is called out on a domestic violence call, it shall be mandatory that the officer make a good faith effort to inform the victim of his or her right to make a citizen's arrest." A separate statutory provision imposes civil liability on public entities for failing to adhere to statutorily-mandated duties:

> Where a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty.

Cal. Gov't Code § 815.6. Defendants argue that, even if § 815.6 imposed a duty of care on them, plaintiffs have presented no evidence that their breach of that duty proximately caused plaintiffs' harm. Defendants argue that "proximate cause cannot be established when a governmental defendant's failure to act allegedly caused injury, but the chain of causation included discretionary determinations for which no liability could be imposed." (Doc. No. 102 at 29.) Plaintiffs respond by contending that if they had been aware of their right to make a citizen's arrest, they would have done so.[3] (UMF at ¶ 72.) Moreover, plaintiffs note FPD officers are

---

[3] According to plaintiffs, "the private person arrest process . . . allows a citizen to request an arrest, which, if probable cause exists, would subject the perpetrator to arrest by law enforcement." (UMF at ¶ 72.) This alleviates the requirement that a victim "hunt down" the suspect. (*Id.*)

15

trained that an arrest is mandatory when there is probable cause to believe that a DVRO has been violated, or when felony domestic battery has occurred. (*Id.* at ¶ 71.) Thus, according to plaintiffs, by defendants failing to inform Pamela Motley and Cindy Raygoza of their right to make a citizen's arrest, their assailants were not arrested, proximately leading to the violent acts taken against them.

A long line of California cases stands for the proposition that "proximate cause [is] not established when a governmental defendant's failure to act allegedly caused the injury, but the chain of causation included discretionary determinations for which no liability could be imposed." *State Dep't of State Hosps. v. Superior Court*, 61 Cal. 4th 339, 353–55 (2015) (citing *Fleming v. State*, 34 Cal. App. 4th 1378 (1995); *State v. Superior Court*, 150 Cal. App. 3d 848 (1984); *Whitcombe v. County of Yolo*, 73 Cal. App. 3d 698 (1977)). Defendants point to two discretionary decisions which, they contend, preclude a finding of proximate cause here. First, defendants claim that the arrest of the assailants in this case is premised upon the inherently discretionary finding of probable cause. Second, they argue that even if an arrest had occurred, whether the assailants would have remained in police custody would have been at the discretion of a judicial officer.

The court concludes that whether the assailants in this case would have remained in custody following their arrest is a question involving the exercise of judicial discretion, which breaks the causal chain for purposes of proximate causation. Even assuming that Paul and Reams had been arrested, it is far from certain that they would have remained in custody. The decision in *Fleming* is instructive in this regard. In that case, the victim's estate brought an action against the state of California and a parole officer alleging negligence for failure to prevent the victim's murder. *Fleming*, 34 Cal. App. 4th at 1381. The assailant was a parolee released from California state prison, who subsequently traveled out of state in violation of his parole. *Id.* at 1382. His parole officer was made aware of this violation, and was also made aware that the parolee was in possession of child pornography. *Id.* Despite this, the parole officer failed to take any steps to have the parolee arrested, after which the parolee proceeded to murder the victim. *Id.* The court found that plaintiffs could not establish that the state or the parole officer proximately caused the

16

victim's death, explaining that the "failure to arrest . . . was not in itself a cause of the injury, since arrest without a period of incarceration would not necessarily have prevented the crime. Incarceration, however, would have involved procedural steps involving the exercise of discretion and thus have broken the causal chain." *Id.* at 1384 (citing *State v. Superior Court*, 150 Cal. App. 3d at 858–59).

Here, plaintiffs cannot and do not dispute the proposition that the setting of bail is within the state court's discretion. *People v. Accredited Sur. & Cas. Co.*, 125 Cal. App. 4th 1, 4 (2004) ("The judicial officer has discretion to reduce bail below the minimum established by the bail schedule"). Under California law, judges must set bail with reference to the applicable bail schedule, but are free to depart from those schedules so long as they "state specific grounds for [their] decision" to do so. *In re Christie*, 92 Cal. App. 4th 1105, 1107 (2001). The court therefore concludes that this discretionary function severs the chain of liability plaintiffs rely upon to establish proximate cause.

Plaintiffs argue that "had Paul been arrested in late March of 2014, pursuant to a citizen's arrest, he very likely would have remained in custody past April 12" because he would have been unable to pay the presumptive bail. (Doc. No. 118 at 19.) Even if this speculation were proven to be true, that still does not resolve the question of whether he would have been required to post bail to secure his release. It may perhaps have been likely or presumptive, but the setting of a cash bail was not compelled as a matter of law because a judge would have had discretion to depart from the bail schedule, or even order an own recognizance release. Because the imposition of bail "would have involved procedural steps involving the exercise of discretion," the causal chain between failing to arrest the assailants and the harm suffered by plaintiffs was severed. *Fleming*, 34 Cal. App. 4th at 1384.

Under these circumstances, it cannot be said that defendants' actions proximately caused plaintiffs' injuries because any decision as to remanding the assailants into custody, or the amount of bail required to secure their release, was purely discretionary. Therefore, despite the tragic consequences suffered here, defendants are entitled to summary judgment in their favor with respect to plaintiffs' state law negligence claims.

17

1 Because defendants are entitled to summary judgment on plaintiffs' negligence claims,
2 they are also entitled to summary judgment on plaintiff Estate of Cindy Raygoza's wrongful
3 death claim. *See Boeken v. Philip Morris USA, Inc.*, 48 Cal. 4th 788, 806 (2010) (quoting 5
4 Witkin, Cal. Procedure, Pleading, § 938 at p. 352 (5th ed. 2008)) ("The elements of the cause of
5 action for wrongful death are the tort (negligence or other wrongful act), the resulting death, and
6 the damages, consisting of the pecuniary loss suffered by the heirs")). For these reasons, the
7 court will grant defendants' motion for summary judgment with respect to plaintiffs' negligence
8 and related claims.

### B.    Defendants' Motion *in Limine*

Defendants have also filed a motion *in limine* to exclude all evidence and witnesses not disclosed by plaintiffs prior to the discovery cut-off in this action. (Doc. No. 106.) The court has not relied on any such evidence in adjudicating defendants' motion for summary judgment, relying only upon the parties' Statements of Undisputed Facts. (Doc. Nos. 103, 120.) Moreover, because the court will grant summary judgment in favor of defendants with respect to all of plaintiffs' claims, it need not address whether the allegedly untimely disclosed evidence would be admissible at trial. Accordingly, defendants' motion to exclude evidence will be denied as moot.

### C.    Plaintiffs' Motion for Sanctions

Plaintiffs have moved for an award of sanctions, arguing that defendants committed various discovery violations during the course of this litigation. (Doc. No. 107.) Specifically, plaintiffs contend that defendants failed to adequately respond to requests for production of documents, submitted boilerplate objections that were irrelevant as to the materials which plaintiffs sought to be produced, and "unduly impeded the flow of information" during depositions. (*Id.*) Defendants object to this motion on both procedural and substantive grounds. Specifically, defendants argue that plaintiff's motion for sanctions was improperly noticed for hearing before the undersigned because Local Rule 302 provides that "[a]ll discovery motions, including Fed. R. Civ. P. 37 motions," are to be brought before the assigned magistrate judge. (Doc. No. 110) (citing Local Rule 302(c)(1)). Plaintiffs respond that they noticed their motion for

/////

1 sanctions before this court rather than the assigned magistrate judge "because they consider it a
2 dispositive motion, given the sanctions they seek." (Doc. No. 117 at 10.)

3 Local Rule 302(c)(1) states that "[a]ll discovery motions" are to be addressed by the
4 assigned magistrate judge. Local Rule 302(c)(1). Discovery in this action is now closed.
5 Plaintiffs' counsel never filed a motion to compel seeking an order from the assigned magistrate
6 judge compelling production of documents, further deposition testimony or the imposition of
7 sanctions against defendants due to their alleged non-disclosure or failure to cooperate in the
8 discovery phase of this litigation. Plaintiffs conceded at oral argument on the pending motions
9 that the arguments they now advance in this regard were never brought to the attention of the
10 magistrate judge during discovery. Plaintiffs also provide no explanation as to why these
11 arguments were not raised at an earlier stage in the litigation, when discovery disputes could have
12 been appropriately addressed. *See Helfand v. Gerson*, 105 F.3d 530, 536 (9th Cir. 1997) ("The
13 failure to obtain this information, however, was the plaintiffs' fault. They did not challenge the
14 defendants' assertion of the privilege. They did not attempt to force production of the documents.
15 By failing to bring a motion to compel production, the plaintiffs waived their objection to the
16 assertion of the privilege, including their contention that the assertion was made in bad faith.").

17 Accordingly, the court will deny plaintiffs' motion for sanctions.

**D.      Plaintiffs' Memorandum Suggesting *Sua Sponte* Reconsideration**

19 Finally, twelve days prior to the hearing on defendants' motion for summary judgment,
20 plaintiffs filed a "Suggestion for *Sua Sponte* Reconsideration of Orders Granting In Part and
21 Denying In Part Defendants' Motions to Dismiss." (Doc. No. 123.) In that filing, plaintiffs
22 contended that the court's prior orders dismissing plaintiff Pamela Motley's negligence claims
23 against defendants Smith and Little based on their failure to arrest Paul, were erroneous. (*Id.* at
24 1–2.) Plaintiffs invited the court to revisit its prior order and reinstate the negligence actions
25 /////
26 /////
27 /////
28 /////

19

against defendants Smith and Little. Defendants did not respond to plaintiff's memorandum suggesting *sua sponte* reconsideration.[4]

Plaintiffs' previously dismissed negligence claims brought against defendants Smith and Little suffer from the same deficiencies as those addressed above, especially with respect to proximate cause. Plaintiffs once again, at most, claim that the judge responsible for setting Paul's bail would have had "good cause to reset his bail above the applicable bail schedule." (*Id.* at 3.) Even were plaintiffs' speculation to be accurate, this does nothing to defeat defendants' argument that the decision regarding bail would have been discretionary rather than mandatory. Accordingly, the court declines plaintiffs' invitation to *sua sponte* revisit its prior orders dismissing plaintiff Pamela Motley's negligence claims against defendants Smith and Little.

## CONCLUSION

For all of the reasons stated above,

1. Defendants' motion for summary judgment (Doc. No. 102) is granted;
2. Defendants' motion *in limine* (Doc. No. 106) is denied as moot;
3. Plaintiffs' motion for the imposition of sanctions (Doc. No. 107) is denied; and
4. The Clerk of the Court is directed to enter judgment and close this case.

IT IS SO ORDERED.

Dated: **January 8, 2018**

UNITED STATES DISTRICT JUDGE

---

[4] Under Local Rule 230(b), "all motions shall be noticed on the motion calendar of the assigned Judge or Magistrate Judge." Further, "[t]he moving party shall file a notice of motion, motion, accompanying briefs, affidavits, if appropriate, and copies of all documentary evidence." A party whose motion is defectively filed shall not be entitled to a hearing on that motion. Local Rule 230(b). Plaintiffs did not notice their memorandum for hearing, and did not file a motion or a notice of motion seeking reconsideration. Plaintiffs' memorandum was therefore not filed in compliance with the Local Rules of this court. Local Rule 230(b) exists to provide both the court and the opposing party with notice of the movant's position, and to allow the opposing party an opportunity to respond. Failure by a party to comply with these Rules may be grounds for the imposition of sanctions. *See* Local Rule 110. Moreover, district courts are free to disregard or deny motions which are not filed in compliance with relevant local rules. *See Martinez v. NDEX W., LLC*, No. EDCV 16-506 PSG (SPx), 2016 WL 9185146, at *1 (C.D. Cal. Oct. 5, 2016); *Lasher v. City of Santa Clara*, No. 5:10-cv-04173-LHK, 2012 WL 381208, at *5 n.4 (N.D. Cal. Feb. 6, 2012). Nonetheless, the court has considered and addressed plaintiffs' memorandum.